**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DAYLIN, INC., DISCOUNT DIVISION, d/b/a Miller's Discount Dept. Stores, Respondent.**

No. 72-2189.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 16, 1973.

Decided March 29, 1974.

Lawrence Levien, Atty., N. L. R. B., Washington, D. C., for petitioner; Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Asst. Gen. Counsel, Charles N. Steele, John M. Flynn, Attys., N. L. R. B., Washington, D. C., on brief.

Milton M. Konowe, New York City, for respondent; Katz & Wolchok, New York City, on briefs.

Gerard C. Smetana, Lawrence M. Cohen, Lederer, Fox & Grove, Chicago, Ill., on brief for the American Retail Federation amicus curiae.

Before EDWARDS, McCREE and MILLER, Circuit Judges.

EDWARDS, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order (reported at 198 N.L.R.B. No. 40). The Board found that respondent Daylin, Inc., had violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq. (1970), by enforcing an illegal no-solicitation rule, by coercive interrogation of one employee, Fugate, and by discriminatorily discharging Fugate and another employee, Bogan, for union activity protected by Section 7 of the Act. Its order required respondent to cease and desist from the first two practices referred to above, and to reemploy Fugate and Bogan with back pay.

Respondent is a retail store chain which operates a discount department store at Kettering, Ohio, where the events with which this case is concerned took place.

In November of 1970 respondent employed 40 employees. Two of them (Fugate and Bogan) were employed in the receiving department in the rear of the store, separate from the selling floor. At their lunch hour on November 25, 1970, Bogan and Fugate met a union [1] organizer at a restaurant and received 15 to 20 union authorization cards which they divided between themselves. As to what happened thereafter, the Trial Examiner found:

> [U]pon returning to the store and still on their lunch break, [they] obtained some signatures on cards from other employees. During the afternoon, other employees came to the receiving room where Bogan and Fugate worked and signed cards. There is disputed testimony that the two men approached employees during working time which, for the purposes of decision, I assume to be true; however, I note that the men were caught up with their work and there is no showing that there was any interference with their duties or the duties of other employees. Having learned from a number of sources that Bogan and Fugate had solicited union cards on company premises and on working time, Store Manager Garrett called them in about 6 p. m. and discharged them.

1. Retail Clerks Union, Local No. 1552, Retail Clerks International Association, AFL–CIO.

The respondent's version of the discharge and the reasons therefor, as set forth in its brief, is as follows:

Store Manager Garrett had Fugate summoned to his office about 6:00 P. M. Present were Garrett, Fugate, Emmons, and the Regional Security Officer, Tom Weigand. Garrett gave Fugate the "No Solicitation Rules" and asked him to read them.

Fugate read the Company's "No Solicitation Rule":

"The Company has a No Solicitation Rule. This means that no employee or other persons are to solicit other employees, or to be solicited, for any purpose. This applies to religious, fraternal, labor, political, charitable, social or any other such organization. All such activities are prohibited on these premises during paid working hours. Any employee violating this rule is subject to disciplinary action including discharge.

"If you have any question regarding this, please contact the Personnel Dept."

Garrett asked if he understood it. Fugate replied that he did. Garrett told Fugate, "I have information that you are soliciting on Company time. It's complete grounds for dismissal," and Garrett asked Fugate to check out and leave.

Bogan then was called to Garrett's office and was also given the Company's "No Solicitation Rule" to read. Garrett told Bogan he had information that he was soliciting on Company time, and it was grounds for dismissal, and requested him to punch out and leave. Bogan denied soliciting other than on his break and lunch period.

Garrett denied that he asked Fugate at this discharge meeting if he had any union cards signed or asked to see the cards. Garrett denied questioning Fugate about union activities at the Miller's Airway Store operated by the Company at another location.

The Trial Examiner and the majority of the National Labor Relations Board found that the respondent's no-solicitation rule was overbroad and (in the absence of any special justification therefor) invalid, and that it had been applied in a discriminatory manner.

They also found that both Bogan and Fugate had been discriminatorily discharged and that Fugate had been subjected to coercive interrogation.

The rationale for these holdings is set forth in the Trial Examiner's decision:

It seems clear that the rule here involved, without question, applies to all areas of the Respondent's establishment without distinction as between selling or nonselling area. In consequence, employees would violate the rule if they were to solicit in nonselling areas such as the stockroom area, restroom, lunchroom or various storage areas. Moreover, the rule prohibits solicitation activity during "paid working hours" and, thus, would prohibit employees from soliciting in nonselling areas during their paid break time. Finally, it abundantly appears that the rule was discriminatorily applied to Bogan and Fugate. Witnesses for the Respondent, including Store Manager Garrett and Second Assistant Manager Haines, testified that the Respondent permitted charitable bake sales, solicitation for employee Christmas and Halloween parties and solicitation of dues for the employees Club, during working hours. Indeed, the Respondent allowed a notice of dues owed by employees to the Club to be posted. Admittedly, Garrett stated that he had a different reaction to solicitation in behalf of the Union than in behalf of other activities. When he became aware of the activities of Bogan and Fugate, Garrett contacted Store Manager Connors at another store of the Respondent and asked his advice with respect to handling the

situation. Connors came over to the store and, according to Garrett's undenied testimony, stated in substance that the Respondent was against the Union.

The problems posed by this case are hardly new ones. In 1945 in the *Republic Aviation* case, the Supreme Court approved the following in the *Peyton Packing Co.* holding of the NLRB:

" 'The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time. Working time is for work. It is therefore within the province of an employer to promulgate and ·enforce a rule prohibiting union solicitation during working hours. Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose. It is no less true that time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint, although the employee is on company property. It is therefore not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours, although on company property. Such a rule must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline.' [49 N.L.R.B. 828, 843–44]." Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803–804 n. 10, 65 S.Ct. 982, 988, 89 L.Ed. 1372 (1945).

Justice Reed concluded:

In the *Republic Aviation* case, petitioner urges that irrespective of the validity of the rule against solicitation, its application in this instance did not violate section 8(3), note 1, *supra,* because the rule was not discriminatorily applied against union solicitation but was impartially enforced against all solicitors. It seems clear, however, that if a rule against solicitation is invalid as to union solicitation on the employer's premises during the employee's own time, a discharge because of violation of that rule discriminates within the meaning of § 8(3) in that it discourages membership in a labor organization. *Id.* at 805, 65 S.Ct. at 989.

■ There seems to us to be no doubt that respondent's no-solicitation rule was overbroad and invalid for NLRA purposes for exactly the same reasons that the Supreme Court dealt with in *Republic Aviation, supra.* Respondent's rule would, of course, properly and lawfully forbid such solicitation on the selling floor, *see* Montgomery Ward & Co. v. NLRB, 339 F.2d 889 (6th Cir. 1965), or in situations where such activity interfered with job performance. *See* Peyton Packing Co., 49 N.L.R.B. 828. But it would also purport to forbid employees from "soliciting" union membership on break time, in rest rooms and in waiting time.[2]

■ "Soliciting" union membership inevitably involves speech. Such speech is not only a right protected by the NLRA, it is also a right protected by the First Amendment, as the Supreme Court held in its first encounter with the soliciting problem. *See* Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L. Ed. 430, rehearing denied, 323 U.S. 819, 65 S.Ct. 557, 89 L.Ed. 630 (1945). Anything favorable said about a union or the labor movement can be construed as "solicitation." *Id.* at 534–535, 65 S.Ct. 315.

2. We emphasize that this case deals only with a no-solicitation rule as it applies to respondent's employees. Nonemployee solicitors pose quite different solicitation problems. *See* NLRB v. Stowe Spinning Co., 336 U.S. 226, 69 S.Ct. 541, 93 L.Ed. 638 (1949) ; NLRB v. Lake Superior Lumber Corp., 167 F.2d 147 (6th Cir. 1948) ; Marshall Field & Co. v. NLRB, 200 F.2d 375 (7th Cir. 1953).

■ On the other hand, no employer has any constitutional or legal obligation to pay for his employees' endeavors on behalf of a union unless by the terms of a labor/management agreement. This is particularly true when soliciting on a selling floor might serve to drive away customers. *See* May Department Stores, Co., 59 N.L.R.B. 976, 981, enforced as modified, 154 F.2d 533 (8th Cir.), cert. denied, 329 U.S. 725, 67 S.Ct. 72, 91 L. Ed. 627 (1946); Montgomery Ward & Co. v. NLRB, 339 F.2d 889 (6th Cir. 1965); May Department Stores Co. v. NLRB, 316 F.2d 797 (6th Cir. 1963). The courts have also recognized that soliciting for a union presumptively interferes with the assigned work of either solicitor or the solicited when one or both have assigned duties. *See* TRW, Inc. v. NLRB, 393 F.2d 771 (6th Cir. 1968); NLRB v. Essex Wire Corp., 245 F.2d 589 (9th Cir. 1957).

As we see this record, it seems clear to us 1) Respondent's no-solicitation rule was invalid because of overbreadth and that it had been discriminatorily enforced. The plain language of the rule shows that it could be enforced to bar solicitation enroute to and from the time clock, on break time, in the rest rooms. Such prohibitions are, as we view the matter, barred by *Republic Aviation, supra*, and by much subsequent case law. Cooper Tire and Rubber Co. v. NLRB, 443 F.2d 338 (6th Cir. 1971); NLRB v. Southern Electronics Co., 430 F.2d 1391 (6th Cir. 1970); NLRB v. Challenge-Cook Bros. of Ohio, Inc., 374 F.2d 147 (6th Cir. 1967).

■ As to discriminatory enforcement, it is clear that there was no prior enforcement at all—although there had been numerous activities which represented as specific violations of the rule, as did the activities of Bogan and Fugate if respondent's version of their activities on November 25, 1970, be accepted.

In the cross-examination of respondent's store manager, the distinction made between solicitation for charitable organizations and for the employee club, and solicitation for this union was frankly acknowledged. There was no enforcement of the company rule at all as to the former solicitations, and as to the latter, there was not only enforcement, but the ultimate penalty available to the employer of discharge without prior warning was invoked. (See Appendix A.)

.2) As we read the same cross-examination of the store manager, it appears to us to constitute substantial evidence that, as the Board implies, the company no-solicitation rule was employed pretextually and that the actual reason for Bogan's and Fugate's discharge was that they were "organizing a union." The store manager made it crystal clear that both were fired after phone calls to national officials of respondent company and after "the message [was relayed] to me to let the two men go."

There is no indication in the record of any prior complaints about either of the discharged employees. Yet the manager gave no warning about violation of the company rule and there was no consideration of any lesser penalty. We find it difficult to believe that if management had ever seen fit to enforce its no-solicitation rule prior to November 25, 1970, it would have employed automatic discharge for an otherwise satisfactory employee who committed the first offense of soliciting for a charitable bake sale. *See* NLRB v. Southern Electronics, 430 F.2d 1391, 1393 (6th Cir. 1970).

All these facts constitute substantial evidence on the whole record to support the Board's finding that "The rule was invoked only when the respondent became aware that Bogan and Fugate were engaged in organizational efforts," and that "the rule was discriminatorily enforced against Bogan and Fugate," in violation of 8(a)(1) and 8(a)(3). *See* Central Hardware Co. v. N.L.R.B., 439 F.2d 1321 (8th Cir. 1971), rev'd on other grounds, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972); NLRB v. Southern Electronics Co., 430 F.2d 1391 (6th

Cir. 1970); NLRB v. Lou DeYoung's Market Basket, Inc., 406 F.2d 17 (6th Cir.), rev'd on other grounds, 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969).

■ 3) There was likewise substantial evidence in the record as a whole that the interrogation of Fugate was coercive and violative of Section 8(a)(1). NLRB v. Gissel Packing Co., 395 U.S. 575, 616, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); NLRB v. McCann Steel Co., 448 F.2d 277 (6th Cir. 1971); NLRB v. Southern Electronics Co., 430 F.2d 1391 (6th Cir. 1970); NLRB v. Mock Road Super Duper, Inc., 393 F.2d 432 (6th Cir. 1968).

We believe, however, that the majority of the Board has sought to decide more than we need to decide in this case. The foregoing analysis, cast in terms of orthodox labor law, appears to us to support the Board's findings and remedial orders without passing upon the rationale adopted by the majority of the Board and bitterly disputed by respondent and amicus curiae, American Retail Federation.[3]

Enforcement of the order of the Board is granted.

## APPENDIX A

Q. What time did you decide to discharge Mr. Bogan and Mr. Fugate?

A. What time?

Q. Yes.

A. At the time I called them to the office.

Q. At the time you called them to the office?

A. Yes.

Q. Now, did you make the decision to discharge them on your own?

A. I was told to discharge them, yes.

Q. By whom were you told?

A. By my home office.

Q. By your home office?

A. Yeah.

Q. Who in your home office told you to discharge them?

A. Well, Mr. Bader.

A. Mr. who?

A. Bader.

Q. How do you spell that?

A. B-a-d-e-r.

Q. B-a-d-e-r?

A. Yes, sir.

Q. What is his position?

A. He's the general manager.

Q. Where is his home office?

A. San Antonio, Texas.

Q. San Antonio, Texas. And you called San Antonio, Texas and told them what?

A. No. Mr. Conners.

Q. All right. Who is Mr. Conners?

A. He is store manager of the Airway store, or was at that time.

Q. How did Mr. Conners find out about it?

3. The Board's majority opinion takes the point of view that "[W]here a no-solicitation rule goes beyond [permissible] limits, as the present one does, it is an unlawful infringement upon the employees' freedom to solicit their fellow employees for (or against) union representation. The rule in such case can provide no justification for the discharge of an employee who violated it. Therefore, if an employee is discharged for soliciting in violation of an unlawful rule, the discharge also is unlawful unless the employer can establish that the solicitation interfered with the employee's own work or that of other employees, and that this rather than violation of the rule was the reason for the discharge." This, of course, would have the effect of shifting the burden of proof as to the challenged discharges from the general counsel to the respondent. To assess the validity of the Board's theory it would be necessary to decide the question whether a no-solicitation rule that is overbroad on its face may, nevertheless be validly enforced against persons engaging in unprotected activity. Because we hold that the no-solicitation rule here was enforced in a discriminatory fashion, and that decision suffices to sustain the Board's remedial order, we need not decide, and we expressly reserve judgment on, this question.

A. Because I called him.

Q. You called Mr. Conners. What time did you call Mr. Conners?

A. Around lunch time. One-thirty, two o'clock. I don't know.

Q. One-thirty, two o'clock?

A. I don't know exactly.

Q. You called Conners and said what? That Fugate and Bogan were organizing a union?

A. Yes.

Q. And what did he say?

A. He said, "I'll be over there in a few minutes." He said, "I'll contact San Antonio."

Q. He'll contact San Antonio. So he did, didn't he?

A. Yes.

Q. And did Mr. Bader call you or you called him?

A. Neither one. Mr. Conners.

Q. Well, how did you—

A. Mr. Conners was doing the talking.

Q. I see. Mr. Conners came over and said that Bader had told you to discharge the two of them, right?

A. Yes.

&ast;　&ast;　&ast;　&ast;　&ast;　&ast;

Q. So at one or one-thirty you testified you called Mr. Conners and told him that Mr. Bogan and Mr. Fugate were trying to organize a union, is that right?

A. Uh-huh.

Q. Why did you tell Mr. Conners that?

A. Well, I knew Mr. Konstanden had just left. He was the regional manager. And Mr. Conners—

Q. Well, why did you bother calling anybody?

A. Huh?

Q. Why did you bother calling anybody?

A. Well, Mr. Conners had been around a long time. So he was the best at hand and I wanted advice.

Q. Advice regarding what?

A. On what to do.

Q. What to do about these two fellows organizing for the union.

A. Yes. Yes.

Q. Okay.

A. Because I'd never been though it before.

Q. You'd never been through it before?

A. No.

Q. I see. This was the first time?

A. Right.

Q. Now, isn't it true that while you were the store manager at Miller's Kettering store that certain activities went on in the store for charitable organizations; for example cake sales? Isn't that right?

A. Yes.

Q. When was the last cake sale? Do you recall?

A. No, I don't.

Q. Did you call Mr. Conners and ask his advice with regard to the cake sales?

A. No, I didn't.

Q. You didn't. You should have. Well, it says no solicitation for any purpose, doesn't it. Read that rule.

A. It says—

Q. It says religious. There is no soliciting for that, is there?

A. Right.

Q. You didn't call Mr. Conners about that, did you?

A. No. I didn't.

Q. You didn't. Okay. Is there an employee organization at the store? There was at the time you were manager, wasn't there?

A. They had an employee club, yes.

Q. An Employee's Club. Don't they collect dues for that Employee's Club?

A. Yes.

Q. As a matter of fact didn't the company allow notice to be put on the

bulletin board as to dues owed by certain employees in the store?

A. No. No notices posted.

Q. No notices were posted?

A. (Shook head).

Q. When did the employees collect dues for this?

A. The first of each month I think.

Q. The first of each month. Isn't it a fact that they would collect them whenever they came a cross an employee whether they were working or not?

A. Yeah.

Q. It is. It is a fact. You didn't call Mr. Conners about that though, did you?

A. No. It's—That's the company policy to have an employee club.

&ast; &ast; &ast; &ast; &ast; &ast;

By Mr. Roketenetz:

Q. You didn't call Mr. Conners about that though, did you, sir?

A. No.

Q. Employees also had parties at the store, didn't they?

A. Yes.

Q. Isn't that right?

A. Yes.

Q. Isn't it a fact that employees would go around and collect money for beer and refreshments for these parties?

A. I guess. They all got together.

Q. You never went to any of these parties?

A. I went to one, yes.

Q. You went to one. Sure you did. Did you give any money for beer?

A. No, I didn't.

Q. You never gave any money?

A. Huh-uh.

Q. Isn't it a fact that they would collect money for dues on company premises?

A. I would imagine so. I had nothing to do with it. I was an advisor.

Q. I see.

A. No capacity at all in the employee's club.

Q. Well, I understand that. But you just testified that such activities went on isn't that right?

A. Yes.

Q. Okay. You didn't call Mr. Conners about that though, did you?

A. No, I didn't.

Q. So your reaction to a union soliciting was somewhat different from other activities being solicited around the company premises, wasn't it?

A. Yes.

Trial Examiner: Well, when you called Conners after being informed of the activities of these two young men what did Conners tell you?

The Witness: He told me he would be over to the store in a few minutes. And he came over there. And we talked in the office. And he tried to call Mr. Delsak. He was unable to get a hold of him.

Trial Examiner: Who is he?

By Mr. Roketenetz:

Q. Who is Mr. Delsak?

A. Sitting right there.

Trial Examiner: What position is he?

The Witness: He is regional general manager.

Trial Examiner: I see.

The Witness: And he was unable to be contacted. So he called Mr. Bader in San Antonio and told him what was going on. And he relayed the message to me to let the two go.

Trial Examiner: To let the two go?

The Witness: Yes.