**RESTAURANT CORPORATION OF AMERICA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 84–1475.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1985.

Decided Sept. 26, 1986.

As Modified Dec. 8, 1986.

Timothy J. O'Rourke, with whom Marshall F. Berman and Michael A. Pace, Washington, D.C., were on brief, for petitioner.

Marc B. Seidman, Atty., N.L.R.B., with whom Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Atty., N.L.R.B., Washington, D.C., were on brief, for respondent.

Before BORK and SCALIA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge BORK.

Opinion dissenting in part and concurring in part filed by Senior Judge MacKINNON.

BORK, Circuit Judge:

Restaurant Corporation of America ("petitioner" or "RCA") petitions for review of a decision and order of the National Labor Relations Board ("NLRB" or "Board"). The Board found that RCA violated section 8(a)(1) and (3) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(a)(1) and (3) (1982), by its disparate enforcement of a facially valid no-solicitation rule and consequent discharge of two employees. The Board cross-petitions for enforcement of its order. Because we con-

clude that the Board's finding misconstrues the Act, is not supported by substantial evidence, and departs without explanation from previous decisions of the Board, we grant the petition for review, deny in part and grant in part the cross-petition for enforcement, and remand to the Board for further proceedings consistent with this opinion.

## I.

Petitioner operates food service facilities at the Watergate complex in the District of Columbia. These facilities include the Les Champs Restaurant, the Peacock Lounge, and the Terrace Restaurant. Since 1975, RCA maintained the following no-solicitation rule, posted at entrances and on employee bulletin boards:

> SOLICITATION OF ANY KIND, INCLUDING SOLICITATION FOR CLUBS, ORGANIZATIONS, POLITICAL PARTIES, CHARITIES, ETC. IS *NOT* PERMITTED ON WORKING TIME OR IN CUSTOMER AREAS. DISTRIBUTION OF LITERATURE OF ANY KIND IS *NOT* PERMITTED ON WORKING TIME OR IN WORKING AREAS. OFF–SHIFT EMPLOYEES ARE *NOT* ALLOWED ON THE PREMISES.

Joint Appendix ("J.A.") at 18 n. 6.

In early 1981, Roxie Herbekian sought work in an organized restaurant through the Hotel and Restaurant Employees Union, Local 25. Upon being advised that such work was unavailable and learning that an organizing effort was underway at the Watergate complex, Herbekian applied for work and was hired there by RCA as a room service operator. A few months later, Herbekian also began working as a waitress at the Peacock Lounge. Herbekian then spoke with the union about an organizing effort among the food service employees at the complex. With the consent of the union, Herbekian began in May 1981 to solicit her co-workers at the Peacock Lounge and the physically adjacent Les Champs Restaurant about organizing a local union. She testified that her solicitation ran as follows:

Generally, what I would say to them is that, in January I had attended a meeting with employees of the Terrace [Restaurant], a Union meeting. And, several of the employees there were interested in organizing. Yet, in order to continue the campaign, we would have to include people in the other restaurants and shops of the Watergate.

And are you—the individual I was speaking to—would you be interested in pursuing getting a Union?

Hearing Transcript ("Tr.") at 32. Herbekian testified that she spoke with twelve people on work time concerning the union campaign prior to June 2, 1981. Tr. at 70–77.

Among those solicited by Herbekian was Sherwood Dameron, a waiter at the Les Champs Restaurant. Herbekian, Dameron, and six other employees attended a union-sponsored meeting on June 2, 1981, to discuss the prospect of organizing the employees of the Watergate complex. At this meeting each person received a list containing the names of fellow employees to contact about signing union authorization cards.

Herbekian subsequently contacted approximately ten employees on work time. Herbekian testified that she met with "[a]bout ten" employees following the June 2 meeting, Tr. at 40, talking with nine specific employees on work time and in the workplace. Tr. at 82–92.

Dameron also spoke with seven employees about the union organizing effort. Though five of these conversations did not occur during work time, two did. Dameron testified that these two solicitations lasted five to ten minutes. Tr. at 299.

On June 9, 1981, the General Manager of the Watergate facilities, Gene Flick, suspended Herbekian and Dameron pending investigation of their alleged violations of the no-solicitation rule. Dameron called Flick the next day to inquire about his employment status and was informed that he had been fired. On June 15, Herbekian was also fired.

## II.

On June 12, 1981, the Union filed a charge with the NLRB alleging that petitioner violated section 8(a)(1) and (3) of the NLRA and on August 26, 1981, the NLRB General Counsel issued a complaint.

Section 8(a) of the NLRB provides in part:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

....

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....

29 U.S.C. § 158(a)(1), (3) (1982).

After conducting a hearing, the Administrative Law Judge concluded that RCA violated section 8(a)(1) and (3) of the Act by disparately enforcing its no-solicitation rule against Herbekian and Dameron. The ALJ based his conclusion on evidence that, during the year prior to the discharges, RCA permitted six nonunion "solicitations." These consisted of the following: (1) sometime in 1980, a collection was taken up to buy a going-away cake for a Les Champs waiter; (2) in December 1980, Les Champs manager Renee Loustaunau helped collect contributions to buy a blazer as a going-away gift for the assistant manager; (3) in December 1980, after Loustaunau mentioned at a staff meeting that the chef's wife was expecting a baby, several employees contributed $1.00 each for the purchase of a spoon as a gift; (4) in December 1980, employees contributed toward the purchase of a birthday cake for a Les Champs waiter; (5) in February 1981, Loustaunau and four employees chipped in to buy a going-

away gift for a housekeeper; and (6) in March 1981, employees collected a total of $12.00 to buy a birthday cake for a Les Champs bartender. The ALJ found that these solicitations occurred, at least in part, on work time.

On August 21, 1984, the Board adopted the ALJ's findings and conclusions in pertinent part and ordered RCA, among other things, to cease and desist from disparately applying its no-solicitation rule, to offer Herbekian and Dameron reinstatement to their former positions, and to remove from its files any references to the unlawful discharges.

## III.

It is not disputed that Herbekian and Dameron violated RCA's no-solicitation rule by engaging in union solicitation during work time. Rather, the Union claimed and the Board found that RCA committed an unfair labor practice by enforcing its no-solicitation rule against Herbekian and Dameron while tolerating the six instances of social solicitation among its employees.[1] Though we recognize that we must accept the Board's findings of fact if supported by substantial evidence, 29 U.S.C. § 160(e) (1982); see *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and that we owe deference to the Board's interpretations of the NLRA, we think the Board's decision in this case misconstrues the Act, is unsupported by substantial evidence, and departs without explanation from prior decisions of the Board.

█ It is well-settled that an employer does not violate section 8(a) simply by maintaining, and enforcing against union activity, a valid no-solicitation rule. *See, e.g., The Seng Co.*, 210 N.L.R.B. 936 (1974); *Atkins Pickle Co.*, 181 N.L.R.B. 935 (1970).

---

1. We accept for purposes of discussion the Board's assumption that the collections for social purposes violated the terms of the employer's no-solicitation rule—though that strikes us as not inevitably true. Whether it did or not, the legal analysis would be the same, since a no-solicitation rule crafted to discriminate against union activity is no better than one lawfully crafted but discriminatorily applied. *Compare Central Freight Lines v. NLRB*, 653 F.2d 1023, 1026 (5th Cir.1981), *with United Aircraft Corp. v. NLRB*, 440 F.2d 85, 96 (2d Cir. 1971).

Both the ALJ and the Board found that RCA's no-solicitation rule was valid on its face, *see* J.A. at 6, 21, and we have no occasion to question that conclusion here.

■ The Board reasoned that RCA's enforcement of its no-solicitation rule against union solicitations but not against social solicitations amounted to disparate application of the rule in violation of section 8(a). It should be noted, however, that the Board has never held, and does not now contend, that tolerance of *any* nonunion solicitation is sufficient to make out a violation of the Act. Rather, the Board's decisions establish that a finding of disparate enforcement depends upon the nature and frequency of the nonunion solicitations permitted. *See The Seng Co.*, 210 N.L.R.B. 936 (1974). Unless the nonunion solicitations have "a potential for interference with work *substantially equivalent* to that of union solicitations," *Central Freight Lines v. NLRB*, 653 F.2d 1023, 1026 (5th Cir.1981) (emphasis added), a finding of disparate application is not warranted. *Cf. Atkins Pickle Co.*, 181 N.L.R.B. at 935 (no-solicitation rule aimed only at union solicitation does not violate section 8(a)(1) where "nothing in the record [indicates] that the isolated instances of other permitted [nonunion] solicitations ... resulted in a corresponding interference with production").

■ We readily accept the Board's findings of fact concerning both the union and nonunion solicitations that occurred on work time during the relevant one-year period. It does not follow from these facts, however, that RCA engaged in illegal discrimination. The Board must carry its "affirmative burden," *Midwest Stock Exchange v. NLRB*, 635 F.2d 1255, 1259 (7th Cir.1980), of showing by substantial evidence that the permitted solicitations "had a potential for interference with work substantially equivalent to that of union solicitations." *Central Freight Lines*, 653 F.2d

at 1026. Though the ALJ characterized the nonunion solicitations in this case as "numerous and substantial," J.A. at 23, and the Board stated that "the incidents of permitted nonunion solicitations were not isolated," *id.* at 5 n. 3, these observations cannot substitute for the requisite finding that the union and nonunion solicitations had substantially equivalent potentials for disruption of work. Both the Board and the ALJ simply failed to consider the relevant potentials. This alone suffices to deny enforcement of the Board's order.[2]

■ In addition, we believe that the particular examples of nonunion solicitation involved here could seldom, if ever, support such a finding of equivalent disruptive potential. All were instances of intra-employee generosity designed to express appreciation of fellow employees on occasions such as birthdays or departures. Whatever minimal disruptive effect such solicitations may have is counter-balanced by an accompanying increase in employee morale and cohesion. It is indeed difficult to contemplate a pleasant workplace in which a reasonable number of such solicitations (if those social amenities which common humanity inspires can even be given that inappropriate term) did not occur. In these circumstances, we hold that the solicitations permitted in this case are not substantially equivalent to union solicitation and that, therefore, RCA's failure to treat the two alike does not constitute "discrimination" within the meaning of section 8(a) of the Act. Any other holding would render maintenance of a no-solicitation rule practically impossible. For instance, under the Board's approach, even a brief exchange between two employees about getting together after work could not be tolerated by employers without engaging in illegal discrimination. Unless employers were willing to enforce no-solicitation rules against such conduct, they would be forced to forgo enforcement of the rule to prevent oth-

2. Our decision today is based upon the finding that the Board's decision is not supported by substantial evidence—a finding which is clearly within our prerogative upon review of a decision by the Board. *See* 29 U.S.C. § 160(e)

(1982). Thus, the Dissent's assertion that we have "trenche[d] on important policymaking prerogatives" of the Board, *see* Dissent at 1403, reflects a misperception of our decision.

er, more disruptive, forms of solicitation. The Act does not require that choice.

Our conclusion is bolstered by the fact that the Board has cited no case, and we are aware of none, in which the type of nonunion solicitation RCA permitted has been held sufficient by itself to support a finding of disparate enforcement. Instead, the prior cases suggest strongly that such a finding is not justified. Nowhere in its decision in this case did the Board attempt to explain its apparent departure from such cases.

*The Seng Co.*, 210 N.L.R.B. 936 (1974), is analogous to the case at bar. There, the Board rejected an ALJ's conclusion that an employer discriminatorily enforced its no-solicitation rule by permitting solicitations among its employees to collect funds for the needy family of a terminated employee, to buy a Christmas gift for their supervisor, and to purchase flowers to send to the funeral of a co-worker's deceased mother. According to the Board, these "beneficent collections ... were too isolated to establish disparate application of the [employer's] lawful rule." *Id.* at 936. Though *The Seng Co.* involved three instances of intra-employee generosity and this case involves six, we think it is more the nature than the number of permitted nonunion solicitations that precludes a finding of disparate enforcement in both cases.

Regardless, other cases have refused to find unlawful discrimination even when incidents of permitted nonunion solicitation were both more numerous and of a somewhat different character than those permitted in *The Seng Co.* For example, in *Serv-Air, Inc.*, 175 N.L.R.B. 801 (1969), the Board held that disparate enforcement was not established by an employer's permission of at least three solicitations to pay for flowers to be sent to the widows of deceased employees and to the hospitalized wife of an employee as well as two solicitations regarding employee contributions to

the Community Chest and the Red Cross. Likewise, in *United Aircraft Corp. v. NLRB*, 440 F.2d 85, 96–97 (2d Cir.1971), the Board found no disparate enforcement of a no-solicitation rule even though the employer permitted "isolated instances" of solicitation for charities and gifts.

Though the solicitations permitted in *Serv-Air* and *United Aircraft* were limited to "beneficent acts," they differ from the solicitations permitted in this case because solicitations on behalf of charities involve outside organizations. In this respect, charitable solicitations are more like union solicitations than are solicitations that represent employees' generosity to one another. Thus, it is significant that the Board has identified no case basing a finding of disparate enforcement solely on an employer's permission of charitable solicitations.[3]

The cases cited by the Board and by the Dissent do not support the Board's decision in this case. For example, in *Midwest Stock Exchange v. NLRB*, 635 F.2d 1255 (7th Cir.1980), the court found that an employer discriminatorily enforced its no-solicitation rule by strictly enforcing the rule against union activities but permitting "[s]uch drives as the Crusade of Mercy, collection of blood in a bloodmobile ... [on the employers'] premises, the selling of Avon products, Tupperware, boat cruise tickets, raffle tickets, Girl Scout cookies, and a number of other items." *Id.* at 1270. Of course, these numerous and varied solicitations were not limited to acts of employee generosity to fellow employees or even to charitable solicitations. Rather, they involved solicitations for personal profit as well as highly organized campaigns on behalf of outside business organizations and thus posed a much greater potential for interference with work than the solicitations RCA permitted here.

The remaining cases cited by the Board are simply inapposite. Though some involved acts of generosity between employ-

---

**3.** Depending on the number and intrusiveness of the solicitations, we assume that such permission could amount to disparate enforcement if the Board found the relevant charitable solicita-

tions to be substantially equivalent to union solicitation in terms of its potential interference with work.

ees, all permitted anti-union or pro-company solicitation, solicitation that is unquestionably "substantially equivalent" to union solicitation. *See, e.g., Midwest Regional Joint Board v. NLRB,* 564 F.2d 434, 446 (D.C.Cir.1977) (disparate enforcement found where "Company countenanced distribution of pro-Company literature ...., while strictly enforcing the rule with respect to the distribution of pro-Union activity"); *Ridgewood Management Co. v. NLRB,* 410 F.2d 738, 740 (5th Cir.) (no-solicitation rule discriminatory where employer permitted solicitations ranging from candy sales to church donations as well as solicitations designed to persuade employees not to unionize), *cert. denied,* 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83 (1969); *NLRB v. Electro Plastic Fabrics,* 381 F.2d 374, 376 (4th Cir.1967) (no-solicitation rule found discriminatory where employer permitted collections for gifts for employees, sales of cosmetics and other merchandise, and anti-union solicitations). The fact that the employer permitted anti-union or pro-company solicitations in all of these cases conclusively distinguishes the present case.

For these reasons the petition for review is granted, the cross-petition for enforcement is denied in part and granted in part,[4] and the case is remanded to the Board for further proceedings consistent with this opinion.

*It is so ordered.*

MacKINNON, Senior Circuit Judge (dissenting in part and concurring in part):

I dissent because of the disparity evident in upholding RCA's discharge of Dameron for "[*l*]*ess than five minutes* ...." (Tr. 287, 289) he spent, while "off the clock," in union solicitation of only two cashier employees at one time, *who were not actually working,* while justifying those more numerous occasions when there was "interference with work" of a great many more employees for non-union purposes in six general solicitations. The disparity is obvious since the employer's Rule is absolute, prohibiting "solicitation of *any kind,* including ... charities, etc. ...." (J.A. 18). Thus, to uphold the firing of Dameron for

4. Because the petitioner does not challenge the Board's finding that the petitioner violated § 8(a)(1) of the Act by coercively interrogating em-

*less* than five minutes of union solicitation while permitting non-union solicitation of more substantial magnitude would be to favor that solicitation which constituted a more substantial *actual interference with work.* In my opinion the majority refuse to follow the settled law on these issues. I would thus uphold the Board's cross-petition to enforce its order as to Dameron and deny it as to Hebekian. My reasoning on the entire case follows:

## I.

The Restaurant Corporation of America, Inc. (the "Company") owns and operates food service facilities in the Watergate complex in the District of Columbia, including Les Champs Restaurant, the Peacock Lounge, the Terrace Restaurant, the Espresso Cafe, a pastry shop, and a delicatessen. Approximately 230 persons, fourteen of whom are supervisory employees, are employed by the Company in the aforementioned enterprises. The Company's food service employees are not represented by a union. Approximately thirty food service employees and three supervisory employees work in Les Champs Restaurant and the Peacock Lounge. In 1975 the Company adopted the following no-solicitation rule applicable to all employees:

Solicitation of any kind, including solicitation for clubs, organizations, political parties, charities, etc. is *not* permitted on working time or in customer areas. Distribution of literature of any kind is *not* permitted on working time or working areas. Off-shift employees are *not* allowed on the premises.

(J.A. 5).

In early 1981 Roxie Herbekian inquired of the Hotel and Restaurant Employees Union, Local 25, AFL-CIO, as to the possibility of finding work in a restaurant with an organized union. When told that such work was available, Herkekian asked whether she might find work in a restaurant that had the prospect of being organized. The union advised her that an organizing campaign was underway in the Watergate facilities operated by the Company.

ployees about union activities, we grant the Board's petition to enforce this part of its order.

Herbekian was hired by the Company in January 1981 to work half-time as a morning room-service operator. The union organizing campaign, however, did not reach fruition. In mid-March Herbekian took on additional work two or three days a week as a cocktail waitress in the Peacock lounge. Herbekian then spoke with the union about an organizing effort among the food service employees of the Company. With the approval of the union Herbekian began speaking to her co-workers about organizing a union local beginning sometime in May 1981. At this point Herbekian was speaking only with employees in the physically adjacent Les Champs Restaurant and Peacock Lounge. Herbekian testified that her solicitation ran as follows:

Generally, what I would say to them is that, in January I had attended a meeting with employees of the Terrace [Restaurant], a Union meeting. And, several of the employees there were interested in organizing. Yet, in order to continue the campaign, we would have to include people in the other restaurants and shops of the Watergate.

And, are you—the individual I was speaking to—would you be interested in pursuing getting a Union?

(Hearing Transcript (Tr.) 32). At this time Herbekian had neither union authorization cards nor union literature. Herbekian testified that she spoke with twelve people on work time concerning the union campaign prior to June 2, 1981 (Tr. 70–77).

Among those solicited by Herbekian was Sherwood Dameron, a waiter at Les Champs. Dameron, Herbekian, and six other employees attended a union-sponsored meeting on June 2, 1981 to discuss the prospect of organizing the employees of the Watergate complex. At this meeting each person received a list containing the names of fellow employees to contact about signing union authorization cards. Herbekian's list contained five names, Dameron's contained six (Tr. 81, 297).

Herbekian met with approximately ten people following the June 2, 1981 meeting.

All of the meetings apparently occurred on work time. Herbekian testified that she met with "[a]bout ten" people following the June 2 meeting (Tr. 40), talking with nine specific employees on work time and in the workplace (Tr. 82–92). Herbekian described these meetings as follows:

I spoke to employees, and I asked employees to sign cards. And, I took those cards. I asked them to sign them, and then they gave them back to me. And, I reported to a number of people who asked me about the meeting, what had happened at the meeting.

(Tr. 40). As a result of these solicitations, Herbekian received seven signed authorization cards (Tr. 42).

Meanwhile, Sherwood Dameron spoke with seven employees about the union organizing effort. Five of the conversations took place entirely *outside* of work time (Tr. 297–300). Dameron spoke with Tiep Bui and Charatsri Maneepanth, *cashiers* at the Espresso Cafe, while Dameron was off the clock, but while Bui and Maneepanth were sitting down together behind the counter, *not actually working* but during work time (Tr. 287, 299). Dameron gave Bui and Maneepanth union authorization cards. He testified that Bui and Maneepanth were not busy, and that the solicitation of Bui and Maneepanth lasted "[l]ess than five minutes" total (Tr. 287, 299).

One of Dameron's non-work time conversations was with Victor Sangster, a chef's helper at Les Champs. Richard Sultoni, a chef at Les Champs affiliated with management, thereafter asked Sangster whether he had been approached recently by anyone concerning a union. Sangster replied negatively. Sultoni asked Sangster what he thought of unions; Sangster replied that he did not know much about unions, but that he would inform Sultoni if he were to be approached regarding a union (Tr. 248–49). Tiep Bui, the cashier in the Espresso Cafe, was also questioned by Sultoni. Bui told Sultoni that Dameron had given her a union authorization card, but that she had left it at home (Tr. 109). Charatsri Maneepanth was questioned by Sultoni the day after

receiving an authorization card from Dameron. Maneepanth named Dameron as the source of the card.

On the morning of Tuesday, June 9, 1981 Roxie Herbekian was summoned to the office of Gene Flick, the general manager of the Company's Watergate facilities. Flick asked whether Herbekian was aware of the Company's no-solicitation rule. Herbekian answered that she was unaware of the rule. Flick gave Herbekian a copy of the rule and reminded her that the rule was prominently posted by the timeclock, in the employee locker room, and on the employee bulletin board in Les Champs and the Peacock Lounge. Flick then suspended Herbekian for three days pending investigation of her alleged violations of the no-solicitation rule. When Herbekian returned to work the following Monday, she was fired by Flick.

Flick called Dameron into his office the afternoon of June 9, 1981, and likewise gave Dameron a three-day suspension pending investigation into the alleged solicitations. Dameron called Flick the next day to inquire into his employment status, whereupon Flick informed him that he had been fired.

## II.

On June 12, 1981 the Union filed a charge with the NLRB alleging that the Company had violated §§ 8(a)(1) & (3) of the National Labor Relations Act.[1] Of importance in the present appeal, the union alleged that the Company had promulgated an overly broad no-solicitation rule, had engaged in several instances of unlawful interrogation of employees, and had disparately enforced its no-solicitation rule in dis-

charging Herbekian and Dameron, thus violating the statutorily protected right of employees to form a labor union. On August 26, 1981 the NLRB General Counsel issued a complaint.

Following a hearing the Administrative Law Judge held that Sultoni's interrogation, for the Company, of Sangster, Bui, and Maneepanth constituted an unfair labor practice under § 8(a)(1) (J.A. 20–21). With respect to the discharges of Herbekian and Dameron the Administrative Law Judge held that the Company's no-solicitation rule was facially valid, but that the no-solicitation rule had been disparately enforced in violation of § 8(a)(3) (J.A. 21–23). The decision of the Administrative Law Judge that the Company had disparately enforced the rule was based on evidence that, during the year prior to the firings of Herbekian and Dameron, there had been six unpenalized general solicitations among the employees of Les Champs and Peacock Lounge, some of which had the approval and participation of management. The record indicates that these were social solicitations for beneficent purposes that took place at least in part on work time.

At some point in 1980 a collection was taken up to buy a cake as a going-away present for Renee Sanjines, a Les Champs waiter. Sherwood Dameron was among those employees who contributed $1.00 toward the cake (Tr. 265). The cake was presented to Sanjines in the presence of the Les Champs and Peacock Lounge employees (Tr. 266).

Three collections occurred during December 1980. Renee Loustaunau, the manager of Les Champs, helped in the collection of

---

1. Section 8(a)(1) provides:
   It shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [National Labor Relations Act § 7]....
   29 U.S.C. § 158(a)(1) (1982).
   Section 7 guarantees employees
   the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted

   activities for the purpose of collective bargaining
   ....
   29 U.S.C. § 157(1982).
   Section 8(a)(3) provides:
   It shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....
   29 U.S.C. § 158(a)(3) (1982).

money in order to buy the Les Champs assistant manager a blazer as a going-away gift. One employee testified that she gave $5.00 toward the blazer (Tr. 162–63). At a staff meeting in 1980 manager Loustaunau mentioned that the chef's wife was expecting a baby. Several employees, including Sherwood Dameron, contributed $1.00 apiece toward the purchase of a spoon as a gift (Tr. 232–34, 250, 266–68). In December 1980 a collection was taken in order to purchase a birthday cake for a Les Champs waiter. Sherwood Dameron was among the contributors and attended the presentation of the cake by the Les Champs waiters and a couple of people from the Peacock Lounge (Tr. 260–61).

In February 1981 four employees and manager Loustaunau contributed money toward a gift for a housekeeper who was leaving the Company's employ (Tr. 164–65, 315–16).

In March 1981 $12.00 was collected to buy a birthday cake for a Les Champs bartender. The cake was presented by the waiters of Les Champs and manager Loustaunau during break time (Tr. 157–58, 261–64).

The Administrative Law Judge characterized these solicitations as "numerous and substantial" (J.A. 23). His opinion states:

> [T]he record [does not] disclose any adverse Respondent reaction to any of these nonunion situations. Against this background of condoned employee and supervisory solicitations, in violation of the rule, Dameron and Herbekian began to organize for the Union. Like the nonunion solicitations, these were conducted, at least in substantial part, on work-time. However, unlike the nonunion solicitations, these were not condoned. Within a week after the union solicitation began, the non-solicitation rule was promptly and vigorously enforced with the discharge of Herbekian and Dameron. It is clear, as a matter of Board and Court precedent, that the selective and disparate enforcement of a no-solicitation rule to prevent union solicitation is unlawful

(J.A. 23). The Administrative Law Judge therefore recommended that the Company be ordered to cease and desist from disparately enforcing its no-solicitation rule. In addition, he recommended that Herbekian and Dameron receive backpay and be offered reinstatement to their former jobs or substantially equivalent employment (J.A. 24–25).

The NLRB General Counsel and the Company filed exceptions and supporting briefs with the NLRB. In a Board decision dated August 21, 1984 the NLRB in large measure affirmed the findings and conclusions of the Administrative Law Judge, and adopted his proposed order without substantial modification (J.A. 8–9).

The Company subsequently petitioned this court for review.

### III.

We must determine whether the decision of the Board is supported by substantial evidence, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951), in deciding that the facially valid no-solicitation rule prohibiting solicitation "of *any* kind" was applied in a fashion that discriminated against the statutorily protected right of employees to form a union. The law is clear that a valid no-solicitation rule applied in a discriminatory manner or maintained for discriminatory reasons may not be enforced against union solicitation. *See Midwest Regional Joint Board v. NLRB*, 564 F.2d 434, 446 (D.C.Cir.1977); *William L. Bonnell Co. v. NLRB*, 405 F.2d 593, 595 (5th Cir.1969).

The statutorily protected organizing rights of employees may be limited only by the legitimate interests of the employer in discipline, workplace efficiency, and property protection. In *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), the Supreme Court held that such cases require "an adjustment between the undisputed right of self-organization assured to employees under the Wagner Act and the equally undisputed right of employers to maintain discipline in

their establishments." *Id.* at 797–98, 65 S.Ct. at 985–86. In *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), a case decided after passage of the Taft-Hartley Act, the Court indicated approvingly that the Board, in an earlier case, had "[r]ecogniz[ed] that the employer could restrict employees' union activities when necessary to maintain plant discipline or production." *Id.* at 110, 76 S.Ct. at 683. The Court again stated: "No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a rstriction is necessary to maintain production or discipline." *Id.* at 113, 76 S.Ct. at 684 (citing *Republic Aviation*, 324 U.S. at 803, 65 S.Ct. at 987).

In *Baylor University Medical Center v. NLRB*, 578 F.2d 351 (D.C.Cir.1978), this court upheld a broadly worded no-solicitation rule that prohibited "solicitation of employees ... by other employees or distribution of literature between employees during work time and/or in work areas." *Id.* at 352. This court held, *inter alia*, that it was not an unfair labor practice for the employer to bar solicitation in the corridors of the medical center, which were defined as "work areas," because solicitation was "the most probable potential recurrent cause of disruption in the corridors.... Having to confront the worry that employees might reduce their standards of service as part of a labor dispute seems an unnecessary and undesirable source of anxiety for persons [patients and visitors] already hard-taxed emotionally." *Id.* at 356. It was therefore the *disruption of the workplace rationale*, extending to the corridors, that this court relied on. *See also id.* at 360–61 (Leventhal, J., concurring in part and dissenting in part). In this respect the court was upheld by the Supreme Court in *NLRB v. Baylor University Medical Center*, 439 U.S. 9, 99 S.Ct. 299, 58 L.Ed.2d 202 (1978).

Decisions of the NLRB are in accord, as stated most clearly in a 1972 decision:

The [National Labor Relations] Act establishes and protects [an employee's] right to engage [in union solicitation], so long as there is no interference with production. Only a substantial business justification, such as a genuine interference with the progress of the work, justifies any restriction on this right of solicitation. A no-solicitation rule is *presumptively,* and only presumptively, valid if it is limited to prohibiting solicitation during the time an employee is expected to be working and not during breaktime, lunchtime, or the like.[2] Such a rule is valid because it is presumed to be directed toward, and to have the effect of, preventing interference with production.

[2] Where it could be shown from the characteristics of the work that union solicitation during worktime would in no way interfere with performance of the work, for example, Lil Abner's mattress-testing job, a no-solicitation rule of any kind would be invalid.

*Daylin Inc., Discount Division,* 198 NLRB 281, 281 (1972), *enf'd,* 496 F.2d 484 (6th Cir.1974). *See also Atkins Pickle Co.,* 181 NLRB 935, 937 (1970); *Emerson Electric Co.,* 187 NLRB 294, 300 (1970); *Hanes Hosiery, Inc.,* 219 NLRB 338, 350 (1975); *Sunnyland Packing Co.,* 227 NLRB 590, 594 (1976) (no-solicitation rule is permissible "provided that the rule or regulation is promulgated in good faith and bears some reasonable relation to *efficient operation of the plant,* and is not merely a device to obstruct or impede self-organization.") (emphasis added); *George Washington University Hospital,* 227 NLRB 1362, 1373–74 (1977) ("The factual recital shows that the prospective solicitation policy generally was widely ignored in practice in respect to nonunion matters which were neither more essential to nor less disruptive of the effective functioning of the hospital than the exercise of the statutory rights here involved...."); *Paceco, A Division of Fruehauf Corp.,* 237 NLRB 399, 401 (1978). *See generally* 2 T. Kheel, Labor Law ch. 9A (1984).

Carefully developed legal doctrine indicates that restrictions on union solicitation must be justified by the employer's legitimate concerns for workplace efficiency. This is the only sensible way to reconcile

the cases in this area. Thus, a ban on solicitation on working time and in working areas is presumptively valid; conversely, an employer may not generally prohibit union solicitation or the distribution of union literature by employees during nonworking times or in nonworking areas. *See NLRB v. Babcock & Wilcox, Inc.*, 351 U.S. at 112–13, 76 S.Ct. at 684–85; *Republic Aviation Corp. v. NLRB*, 324 U.S. at 797–98, 65 S.Ct. at 985. Employees may be restricted to distributing union literature and materials to nonworking time and nonworking hours. *See id.* Retail stores may ban solicitation from selling areas, though not from nonselling areas during break time or waiting time. *See Marshall Field & Co.*, 98 NLRB 88 (1952), enf'd, 200 F.2d 375 (7th Cir.1953); *Daylin, Inc.*, 198 NLRB 281 (1972), enf'd, 496 F.2d 484 (6th Cir. 1974). Restaurants may ban employee solicitation during nonworking time to noncustomer areas, *see Bankers Club, Inc.*, 218 NLRB 22 (1975), as hospitals may ban solicitation from patient care areas. *See Beth Israel Hospital v. NLRB*, 437 U.S. 483, 500–07, 98 S.Ct. 2463, 2473–76, 57 L.Ed.2d 370 (1978).

Disparate enforcement inherently requires a finding that the employer treated similar conduct differently. *Midwest Regional Joint Board v. NLRB, supra,* at 442. This is a fact-based inquiry in which the Board proceeds on a case-by-case basis. *See, e.g., Hammary Manufacturing Corp.*, 265 NLRB 57, 57 n. 4 (1982); *Saint Vincent's Hospital*, 265 NLRB 38, 38–41, enf'd, 729 F.2d 730, 735 (11th Cir.1984). This court must therefore determine whether, in terms of actual interference with workplace production and discipline, the union solicitations by Herbekian and Dameron were substantially equivalent to the condoned instances of employee collections for social purposes.

## IV.

As mentioned above, the Company had condoned six general instances of solicitations for social purposes during the year prior to the discharge of Herbekian and Dameron. These solicitations, however, were nothing more than the ordinary, *ad hoc* expressions of friendship that naturally occur among small groups of people. Most of the solicitations involved individual requests for contributions of $1.00 among a small group of friends and co-workers. These solicitations took only a few seconds.

Herbekian's solicitations on behalf of the union stand in marked contrast to the condoned non-union solicitations. Over scarcely more than a month Herbekian spoke on twenty-two occasions with other employees about the union. Each solicitation occurred on work time in clear violation of the Company's rule. Moreover, Herbekian violated the no-solicitation rule in a systematic fashion quite different from the spontaneous social collections that had occurred on six occasions over the past year. It is equally obvious that Herbekian's solicitations on behalf of the union were significantly more involved than, say, a simple request to chip in for a birthday cake. According to Herbekian's testimony, her solicitations on behalf of the union often involved an explanation of the comparative merits of the union's dental, hospitalization, and legal plans (Tr. 97–98). I therefore conclude, after considering the comparative *disruption of the workplace* that resulted from the solicitations for the union by Herbekian and the solicitations of some employees for purely social purposes, that there is no substantial evidence that the Company disparately enforced its no-solicitation rule to the prejudice of Herbekian. The object of the rule is to protect against interference in the workplace, and the interference by Herbekian was very substantial and concentrated while the interference caused by the social solicitations was very minimal and irregular. Since the degree of interference varied greatly the facts do not support the Board's finding of a disparate application of the rule.

With respect to Sherwood Dameron, he violated the no-solicitation rule in his conversation with Bui and Maneepanth. According to Dameron's testimony, the conversation lasted a total of "[l]ess than five

minutes" (Tr. 299), during which time he presented some of the merits of forming a union (Tr. 286–88). Dameron spoke with five other employees regarding the union, but these conversations took place outside of work time and thus could not form the basis for valid enforcement of the Company's rule. The interference in the workplace caused by Dameron's solicitation was very substantially less than that caused by Herbekian's solicitations.

It bears repeating that the "essence of discrimination in violation of section 8(a)(3) is treating like cases differently." *Midwest Regional Joint Board v. NLRB, supra,* at 442. Dameron was discharged because of his solicitation of two employees on work time, which clearly violated the Company's no-solicitation rule.[2] Of course, the social solicitations engaged in by the Company's employees were also admittedly in violation of the no-solicitation rule. We must decide whether, in terms of the *actual disruption of the workplace,* the respective solicitations were substantially equiva-

lent. The social solicitations permitted by the Company were only nominally disruptive of the workplace, but the same is true of Dameron's solicitation of Bui and Maneepanth. And although the six instances of condoned solicitations lasted only a few seconds, each instance apparently involved between three and twelve employees. Dameron's joint solicitation, while he was "off the clock," of the two employees who were not working lasted "[l]ess than five minutes," (Tr. 299), and was thus of lesser duration than the six condoned solicitations of substantially more employees, and Dameron's violative solicitation involved only two employees.

On the factual record the Administrative Law Judge's characterization of the condoned solicitations as numerous and substantial is unsupported. However, in terms of workplace disruption, Dameron's prohibited solicitation and the condoned social solicitations were both *de minimis,* and thus substantially equivalent. For purposes of our inquiry, then, the condoned

2. On appeal the Company argues that Dameron's discharge must be understood in the context of the union's intention to solicit all 200 of the employees in the Watergate complex. *See, e.g.,* Company Brief at 23, 31. However, such reasoning distorts the statutory scheme, and misinterprets the law dealing with no-solicitation rules.

Assessing the validity of no-solicitation rules requires the Board to serve two sometimes-conflicting precepts: first, the imperative right of the employer to preserve the efficiency of the workplace; and, second, the statutorily protected right of employees to form labor unions. Thus, a broad no-solicitation rule, such as the one in this case, may validly provide for a general prohibition on work time solicitations. However, when employee solicitations are made pursuant to the statutorily protected right to form labor unions, the Board must ensure that the rule is enforced without regard to the content of the solicitation. Moreover, since the underlying premise of the no-solicitation rule lies in preserving an efficient workplace, our focus must be on the *actual disruption* that occurs in the breach of the rule. In determining the validity of *Dameron's* discharge, it is therefore irrelevant that Herbekian violated the rule on numerous occasions or that the union had designs on organizing the Company's employees, because the Board's focus must be on whether *Dameron's* actions by themselves were sufficient to warrant a valid discharge when

compared with unpunished instances of non-union solicitation. In the same fashion, it is irrelevant that Dameron solicited five employees outside of work time—and thus outside of the no-solicitation rule in this case—because the five solicitations could not form the basis of a valid discharge.

The Company additionally seems to misconstrue the very notion of disparate enforcement, *i.e.,* treating like things differently. *See Midwest Regional Joint Board v. NLRB, supra,* at 442. The Company assumes that there exists some threshold level of non-enforcement, under which the no-solicitation rule remains valid and over which the rule is invalid when applied to labor union solicitations. *See* Company Reply Brief at 4. The majority opinion unfortunately seems dangerously close to accepting such a position. Maj.Op. at 1395 ("no case ... in which the type of nonunion solicitation RCA permitted has been held sufficient *by itself* to support a finding of disparate enforcement."). The disparate enforcement inquiry does not, however, give the Board license to make such distinctions. The Board instead must measure, in terms of the *actual disruption to the workplace,* the instances of condoned, non-union solicitations against the instances of union solicitations that led to the employee's discharge. *See supra* at p. 1399 *et seq.* Only then can the Board, and this court on review, determine whether the employer "treat[ed] like cases differently." *Midwest Regional Joint Board, supra.*

solicitations and the solicitations of Dameron both violated the rule prohibiting "[s]olicitation of any kind ..." and were like cases treated differently by the Company. I therefore find substantial evidence that the Company in its discharge of Dameron disparately enforced its no-solicitation rule in violation of § 8(a)(3).[3]

## V.

Despite the clarity of the controlling law, the majority opinion ignores it and trenches on important policymaking prerogatives of the National Labor Relations Board. First, the broad mandate of the National Labor Relations Act simply cannot negate the Board's decision in this case. The Act gives the Board authority to define the contours of § 7 rights. *See Hudgens v. NLRB,* 424 U.S. 507, 522, 96 S.Ct. 1029, 1037, 47 L.Ed.2d 196 (1976). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron v. Natural Res. Def. Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). *Cf. United States v. Fulton,* — U.S. —, —, 106 S.Ct. 1422, 1426, 89 L.Ed.2d 661 (1986) ("We must uphold [the agencies'] interpretation if the statute yields up no definitive contrary legislative command and if the agencies' approach is a reasonable one.").

Therefore, I cannot accept the majority's reluctance to accept the Board's long-standing treatment of social solicitations in cases such as the present one. The majority asserts:

In addition, we believe that the particular examples of nonunion solicitation involved here could seldom, if ever, support such a finding of equivalent disruptive potential. All were instances of intra-employee generosity designed to express appreciation of fellow employees

on occasions such as birthdays or departures. Whatever minimal disruptive effect such solicitations may have is counterbalanced by an accompanying increase in employee morale and cohesion. It is indeed difficult to contemplate a pleasant workplace in which a reasonable number of such solicitations (if those social solicitations which common humanity inspires can even be given that name) did not occur.

Maj.Op. at 1394. This attempt to distinguish beneficient collections for fellow employees from other solicitations is a pure statement of policy. Board decisions have consistently demonstrated that social solicitations should be considered along with union solicitations in addressing claims of disparate treatment under an absolute no-solicitation rule such as is involved here. *See, e.g., The Seng Co.,* 210 NLRB 936 (1974); *Daylin Inc., Discount Division,* 198 NLRB 281 (1972), *enf'd,* 496 F.2d 484 (6th Cir.1974); *Hanes Hosiery, Inc.,* 219 NLRB 338 (1975); *Sunnyland Packing Co.,* 227 NLRB 590 (1976); *George Washington University Hospital,* 227 NLRB 1362 (1977); *Saint Vincent's Hospital,* 265 NLRB 38 (1982), *enf'd,* 729 F.2d 730 (11th Cir.1984); *Lance, Inc.,* 241 NLRB 655 (1979); *Montgomery Ward & Co.,* 224 NLRB 104 (1976).

Although the majority insists that it is merely holding that "the Board's decision is not supported by substantial evidence," Maj.Op. at 1394, footnote 2, the majority erroneously evaluates the evidence according to a new legal standard—that a Board finding of disparate application of a no-solicitation rule will not be deemed to be supported by substantial evidence absent a finding that "non-union solicitations have 'a potential for interference with work *substantially equivalent* to that of union solicitation.'" Maj.Op. at 1394 (quoting *Central Freight Lines v. NLRB,* 653 F.2d

**3.** The Board invites us on appeal to link the § 8(a)(1) violations committed by Sultoni with Dameron's discharge. *See, e.g.,* NLRB Brief at 15–16. However, neither the Administrative Law Judge nor the Board relied on Sultoni's § 8(a)(3) violation in the discharge of Dameron, and such *post hoc* rationalization cannot support the Board's decision.

1023, 1026 (5th Cir.1981)), The "potential for interference" standard employed by the majority, however, derives not from a Board decision, but from *dicta* in a Fifth Circuit decision that *denied enforcement* to a decision of the Board. The majority's decision thus is hardly compelled by the weight of authority. As set forth above, the well-settled rule requires an evaluation of the *actual interference* with the efficiency or discipline of the workplace. *See supra* at 1394–1396. Even if we were to apply the rule advocated by the majority it would not justify the disparate treatment involved in the discharge of Dameron for less than five minutes of off duty solicitation of two cashiers who were not working.

## VI.

In conclusion, I would affirm the Board's holding that the Company's discharge of Sherwood Dameron for conduct that involved only very minimal actual interference with the workplace, constituted disparate treatment in violation of § 8(a)(3) of the Act. With respect to Roxie Herbekian, her union solicitations in violation of the no-solicitation rule were substantial, concentrated and disrupted the workplace and thus her discharge was not disparate treatment in violation of § 8(a)(3). I would therefore deny enforcement of the Board's decision that the company violated § 8(a)(3) in the discharge of Herbekian. Dameron is entitled to receive backpay and reinstatement to his former job or substantially similar employment. It is noted that Dameron's eligibility for an award of backpay is subject to be mitigated by any money he earned or could have earned between the time of discharge and the time of our decision. The Company does not challenge the Board's decision that the Company violated § 8(a)(1) of the Act by interrogating employees about union activities. I would therefore affirm the Board in this respect and remand the case to the NLRB for further action not inconsistent with this opinion.