**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SAINT VINCENT'S HOSPITAL, Respondent.**

No. 83–7203.

United States Court of Appeals, Eleventh Circuit.

April 9, 1984.

---

Elliott Moore, Deputy Assoc. Gen. Counsel, Peter M. Bernstein and Ellen A. Farrell, N.L.R.B., Washington, D.C., for petitioner.

Harry L. Hopkins, Lang, Simpson, Robinson & Sommerville, Birmingham, Ala., for respondent.

Before GODBOLD, Chief Judge, RONEY and SMITH[*], Circuit Judges.

GODBOLD, Chief Judge:

We grant in part and deny in part the Board's petition for enforcement.[1]

St. Vincent's is a large hospital in Birmingham, Alabama, having seven floors, two wings, and over 1,000 employees. In 1979 the union[2] began an organizational drive. The hospital opposed unionization.

I. The overly broad "no insignia" rule.

By a provision in its employee handbook published in 1978 the hospital required all personnel to wear identification badges when on duty, and it permitted them to wear official school or occupational pins but forbade "other insignia, pins, or buttons" while the employee was on duty or while in uniform on hospital property. A school pin identifies the school of nursing from which a nurse has graduated. An occupational pin identifies the wearer as, for example, a registered nurse or licensed practical nurse.

April 16, 1980 supervisor Piccard was making a periodic inspection for dress code compliance. She inspected employees on various shifts for the proper display of the identification badges required of all employees and their general compliance with the dress code. She found employees

---

[*] Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

[1]. The Board's decision is *St. Vincent's Hospital,* 265 N.L.R.B. No. 6 (1982).

[2]. Local 1199, National Union of Hospital and Health Care Employees, Retail, Wholesale, and Department Store Union, AFL–CIO.

wearing various types of paraphernalia, such as extra pins, bunny rabbits, and chickadees, and asked them to remove all items except their identification badges and nurse's or school pins. In a patient care area Piccard approached Hildreth from a distance and saw that Hildreth was wearing a school pin and another pin and asked if the other pin was a nursing pin. When Hildreth replied in the negative, Piccard requested its removal. When Hildreth was in the process of removing it, Piccard noted that it was a union pin. Piccard advised Hildreth that the union pin was contrary to hospital policy, not part of the uniform, and that she was not to wear anything on her uniform except her name tag and her school designation. Hildreth responded by inquiring whether the practice of other employees in wearing various pins, flowers and other insignia was against hospital policy also, to which Piccard replied in the affirmative.

The ALJ found that the "no insignia" rule was overly broad and unlawful, as it was not restricted to patient care areas, and therefore the hospital, by maintaining the dress code, violated § 8(a)(1) of the Act. While there was no evidence that in the particular instance the dress code was discriminatorily enforced, the overly broad "no solicitation rule" (a union button being a form of solicitation) was invalid for all purposes.

The hospital amended the "no insignia" rule on September 15 to limit its application to patient care areas. The ALJ concluded that, since Hildreth was neither reprimanded nor warned, no remedy was appropriate under the circumstances beyond an appropriate order to ensure the hospital's future compliance with the Act in the maintenance and enforcement of a dress code; also, since there was no contention of discriminatory enforcement and no contention that the revised code (which does not appear unlawful on its face) was overly broad,

mandating a remedy would not serve a useful purpose.

The Board accepted the ALJ's findings but held that he erred in not providing a remedy. The Board found that the hospital's maintenance of the "no insignia" rule over a period of approximately two years was a serious restriction of the § 7 rights of its employees, and therefore, the case was not one in which the violation of the Act was insufficiently serious to warrant the issuance of a remedial order. The Board also noted that under some circumstances an employer may repudiate its unlawful conduct and thereby relieve itself from liability but that the amendment of the rule was not a repudiation, citing *Passavant Memorial Area Hospital*, 237 N.L.R.B. 138 (1978). *Cf. Baldor Electric Co.*, 245 N.L.R.B. 614 (1979). The hospital does not seek the benefit of the repudiation doctrine but urges that the maintenance of the rule for two years, plus a single instance of an employee's being asked to take off a union button, does not constitute sufficiently serious conduct to justify a remedial order. But the potential inhibitory effect of the rule, even if not enforced, justifies Board action. *Paceco v. NLRB*, 601 F.2d 180 (5th Cir.1979). In *Paceco*, as here, the employer contended that its rules may have only technically violated the Act and it had attempted to rewrite them to remove the defect. Moreover, the hospital's rule was enforced against Hildreth.[3]

## II. Interrogation by supervisor Vann.

■ On September 1 supervisor Vann was at the nurses' station on third [floor] main, an obstetrical ward that has many visitors. There had been thefts of billfolds from both patients and employees on that floor. On the floor is a locker room used by nurses for, among other things, storing their purses. Among Vann's duties was policing the locker room to see that no one entered that she did not recognize. She thought that the locker room was empty.

---

**3.** The hospital says this was the only time the rule was ever enforced. The Board did not prove any other examples of enforcement, but the hospital did not prove nonenforcement (except with respect to supervisor Piccard, who said she had never before asked an employee to remove a union button).

She heard the locker room door open, looked up, and saw a nurse whom she did not recognize walk to her station. She tried to stop the nurse with an "excuse me." The nurse kept walking; Vann got up and followed her and stopped her down the hallway with another "excuse me."

Vann asked the nurse if she had just come out of the locker room, and the nurse turned around to face Vann and answered that she had. Vann noticed papers that the nurse had in her hand and recognized them as union literature. Vann then asked what the nurse was doing there and whether she had left some of the literature in the locker room. The nurse laughed and replied that she had and that she could do anything she wanted in a non-patient area on her own time. Then Vann asked for her name and whether she was on her lunch time or break time, and the nurse gave her name, Hildreth, and stated that she was on her lunch break. Vann asked where she worked, to which she responded "seventh main," and Vann thanked her and walked away.

The nurse was the same Hildreth who had been involved in the union button incident. Vann did not recognize Hildreth as anyone she knew, even after Hildreth identified herself, and did not reprimand her for leaving literature in the locker room; in fact, she neither reprimanded nor scolded Hildreth in any way. There was no connection shown between this questioning of Hildreth and her prior union activities. The incident occurred on the last day of Hildreth's employment with the hospital, but her employment ended for reasons unrelated to her union activities or to the incident—she resigned to marry and move to Chicago.

The ALJ found that the questioning was an isolated incident, not part of any systematic or intensive interrogation, and that Hildreth gave truthful answers without fear of reprisal.[4]

The ALJ found that the facts did not rise to the level of coercion. The Board accepted the ALJ's findings of fact but disagreed with his conclusion. It recognized that the propriety of Vann's effort to police the area could not be questioned but found that she exceeded her policing function. This conclusion was based upon, first, the fact that after Vann recognized that Hildreth was holding union literature she asked questions relating to Hildreth's union activities, including inquiries as to why she was in the area and whether she had distributed leaflets in the locker room. And, second, following Hildreth's assertion that she could distribute literature on her own time, Vann pursued the issue by asking whether she was on lunch time or break and asking her name and her work location. Third, Vann did not inform Hildreth of her purpose and did not mention the theft problem or her policing function. The Board also found that the ALJ erred in relying on the pleasant atmosphere surrounding the encounter. As its ultimate conclusion the Board found that viewing the record as a whole Vann's questions focused on Hildreth's union activity and were unrelated to security considerations.

We recognize the Board's expertise in events of the work place, but neither expertise nor the record supports its conclusion in this instance. The reasonable way for Vann to attempt to carry out her security task was to find out whether the unknown and unidentified person had been in the locker room, what she claimed to have been doing there, who she was, or purported to be, and, if she claimed to be an employee of the hospital, where she claimed to work. Necessarily implied in the Board's ultimate conclusion is an unstated premise that once the unidentified person was seen to have union literature in her hand and stated that she had been distributing it in the locker room, Vann could ask nothing more about her name, her activities, or her work sta-

---

4. The ALJ found that Hildreth claimed to have been orally warned by her supervisor about distributing union literature; the supervisor denied that this occurred. This claimed warning was not alleged to be a violation of the Act, and the ALJ made no findings about whether it occurred.

tion in the hospital. Neither the record nor common sense supports a conclusion that once it was revealed that Hildreth *purported* to be acting to further union interests additional questions were "unrelated to security considerations." To Vann, Hildreth was an unknown person, and, in a high theft area, emerging from a place that Vann was obligated to police and in which employees stored their purses. Hildreth's right to be in the locker room was neither known nor apparent. Her *assertions* of a right to be in the locker room did not establish that she *actually had* such a right; nor did it forbid questions about her assertion. Vann was not merely permitted but was obligated to pursue questioning sufficiently to satisfy herself whether Hildreth's *purported* status and *purported* activity as a person distributing union literature were her *actual* status and activity.[5]

Vann did pursue the questioning, and presumably was satisfied of Hildreth's bona fides. We do not suggest that Hildreth's actual status and actual activity were any different than she represented them to be. We only hold that Vann could—indeed was obligated to—inquire.

The Board's conclusion cannot be supported by Vann's not having told Hildreth of the theft problem and of her policing function. The questions asked by Vann were valid security-based inquiries whether or not Hildreth purported to be acting for union purposes; they bore no anti-union taint and required no explanation.

### III. Solicitation of surveillance.

■ The ALJ found that the hospital instructed Gilbert, a supervisor, to surveil its employees' union activities and inform it with respect thereto, and held that this violated the Act. The Board accepted these findings.

The ALJ's conclusions were based on the following findings. A supervisor asked Gilbert if he knew that the union was "outside" handing out handbills and inquired whether he knew any of the employees involved. Gilbert responded that he knew of the distribution but did not know any of the employees. The supervisor identified by name three of the employees involved and in Gilbert's presence requested the particular location where one of them worked. The supervisor then instructed Gilbert to keep his eye on the employees and to report the matter to security director King. Gilbert did so by leaving a note in King's desk, as he had been instructed to do, so that the names could be turned over to the hospital's attorneys and would not be detected if the hospital's files were subpoenaed to court.[6]

The supervisor did not merely request Gilbert to pass on information that had innocently come into his possession. *See P.R. Mallory Co., Inc.,* 175 N.L.R.B. 308, 313 (1969). She did not merely remind him to do his job as a guard. There is no evidence that what the employees were doing was illegal or improper or interfered with the hospital or its patients or visitors. Giving a supervisor the names of the employees and information on where at least one of them worked, followed by instructions to keep an eye on them and to report information in a manner that would conceal it from attorneys for the hospital and keep it beyond the reach of legal proceedings, justifies the Board's conclusion that the surveillance, though solicited to be performed by a supervisor, violated the Act. Requiring surveillance of union activities by a supervisor violates § 8(a)(1) *if it interferes* with the organizational rights of employees. *Belcher Towing Co. v. NLRB,* 614 F.2d 88 (5th Cir.1980). An explicit finding of interference is unnecessary where an inference of interference may reasonably be drawn. *Id.* at 91 n. 4.

5. The Board "noted" that Hildreth was the same person against whom the "no insignia" rule had been enforced. No evidence, however, supports any connection between the two incidents or any knowledge by Vann concerning the incident or of Hildreth as a participant in it. Indeed, such evidence as there is disclaims any such connection or knowledge.

6. This procedure was said to have been instituted by King before counsel of record were retained.

We reject the contention of the hospital that this issue was not fully and fairly litigated. Paragraph VII of the complaint alleged that the hospital solicited its employee to surveil. At the hearing the hospital proved that Gilbert was a supervisor, and the Board does not contest this. The general counsel did not amend the complaint but during the presentation of his case stated that Gilbert's testimony was being offered in proof of paragraph VII and that he believed the conduct of the supervisor requiring the surveillance was unlawful even if the request was made to a supervisor. The hospital had adequate notice of the gist of the charges against it, i.e., that one of its staff had sought to surveil the union activities through another member of its staff, and it had fair notice during the hearing of both the facts relied upon and the Board's legal theory. Its failure to call the requesting supervisor as a witness to her conversations with Gilbert does not vitiate the validity of the findings and conclusions reached.

IV. Discipline for solicitation.

■ Two employees, Menefee and Miles, were reprimanded, and one employee, Miles, discharged for soliciting on behalf of the union in patient care areas in violation of a hospital policy. The policy is not contended to be per se unlawful but rather to have been discriminatorily applied.

The ALJ found that the solicitations had been made in patient care areas and in violation of the policy. Also, while there was evidence that other solicitations had been permitted, the ALJ concluded there had not been a discriminatory or sudden enforcement of the rule as to Miles or Menefee so as to make the application to either of them unlawful. The Board, however, reviewed the record at great length, rejected the ALJ's findings of no discriminatory or sudden enforcement of the rule, and found contrary to the ALJ. We too have scrutinized the record, and we cannot say that the Board's finding is not supported by substantial evidence.

Enforcement is GRANTED in part, DENIED in part.