**RESTAURANT CORPORATION OF AMERICA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 85–1475.

United States Court of Appeals, District of Columbia Circuit.

Aug. 25, 1987.

MacKINNON, Senior Circuit Judge:

The Restaurant Corporation of America, Inc. (the "Company") petitions for review of a decision and order of the National Labor Relations Board. The Board determined that the Company had violated section 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) by disparately enforcing its absolute no-solicitation rule by suspending and discharging employees Dameron and Herbekian because of their union activities. 271 N.L.R.B. 171 (1984). The Board cross-petitions for enforcement of its order. For the reasons set forth below, we grant the Board's cross-petition to enforce its order as to Dameron and deny it as to Herbekian.[1] Our colleague concurs in our opinion insofar as it upholds the Company's suspension and discharge of Herbekian but dissents from our refusal to uphold the suspension and discharge of Dameron. Thus, the pivotal issue within the court is whether the Company disparately enforced its no-solicitation rule in discharging Dameron, who, when off-duty, made *one* isolated union solicitation (lasting less than five minutes) of two non-working employees seated together, while not enforcing the rule against employees who made numerous social solicitations of working employees.

Petition for Review and Cross-Petition for Enforcement of an Order of the National Labor Relations Board.

Marc B. Seidman, Atty., Robert E. Allen, Associate General Counsel, and Elliott Moore, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., were on respondent's petition for rehearing.

Timothy J. O'Rourke, Marshall F. Berman and Michael A. Pace, Washington, D.C., were on petitioner's response to the petition for rehearing.

### ON PETITION FOR REHEARING

Before MIKVA and BORK, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

Opinion dissenting in part and concurring in part filed by Circuit Judge BORK.

I.

The Company owns and operates food service facilities in the Watergate complex in the District of Columbia, including Les Champs Restaurant, the Peacock Lounge, the Terrace Restaurant, the Espresso Cafe, a pastry shop, and a delicatessen. Approximately 230 persons, fourteen of whom are supervisory employees, are employed by the Company in the aforementioned enterprises. The Company's food service employees are not represented by a union. Approximately thirty food service employees and three supervisory employees work in Les Champs Restaurant and the Peacock Lounge. In 1975 the Company adopted the

---

**1.** The court's opinion is being issued upon rehearing of this case. The original opinion, 801 F.2d 1390 (D.C.Cir.1986), has been vacated.

following *absolute* no-solicitation rule applicable to all employees:

> Solicitation of any kind, including solicitation for clubs, organizations, political parties, charities, etc. is *not* permitted on working time or in customer areas. Distribution of literature of any kind is *not* permitted on working time or working areas. Offshift employees are *not* allowed on the premises.

(Joint Appendix (J.A.) 5) (emphasis in original).

In early 1981 Roxie Herbekian inquired of the Hotel and Restaurant Employees Union, Local 25, AFL–CIO, as to the possibility of finding work in a restaurant with an organized union. When told that such work was not available, Herbekian asked whether she might find work in a restaurant that had the prospect of being organized. The union advised her that an organizing campaign was underway in the Watergate facilities operated by the Company.

Herbekian obtained employment from the Company in January 1981 to work half-time as a morning room-service operator. The union organizing campaign, however, did not reach fruition. In mid-March Herbekian took on additional work for two or three days a week as a cocktail waitress in the Peacock lounge. Herbekian then spoke with the union about an organizing effort among the thirty or so food service employees of the Company. With the approval of the union, Herbekian, sometime in May 1981, began speaking to her co-workers about organizing a union local. At this point Herbekian was speaking only with employees in the physically adjacent Les Champs Restaurant and Peacock Lounge. Herbekian testified that her solicitation ran as follows:

> Generally, what I would say to them is that, in January I had attended a meeting with employees of the Terrace [Restaurant], a Union meeting. And, several of the employees there were interested in organizing. Yet, in order to continue the campaign, we would have to include people in the other restaurants and shops of the Watergate.

And, are you—the individual I was speaking to—would you be interested in pursuing getting a Union?

(Hearing Transcript (Tr.) 32). At this time Herbekian had neither union authorization cards nor union literature. Herbekian testified that she spoke with twelve people on work time concerning the union campaign prior to June 2, 1981 (Tr. 70–77).

Among those solicited by Herbekian was Sherwood Dameron, a waiter at Les Champs. Dameron, Herbekian, and six other employees attended a union-sponsored meeting outside their work places on June 2, 1981 to discuss the prospect of organizing the employees of the Watergate complex. At this meeting each person received a list containing the names of fellow employees to contact about signing union authorization cards. Herbekian's list contained five names; Dameron's contained six (Tr. 81, 297).

Herbekian met with approximately ten people following the June 2, 1981 meeting. All of the meetings apparently occurred on work time. Herbekian testified that she met with "[a]bout ten" people following the June 2 meeting (Tr. 40), talking with nine specific employees on work time and in the workplace (Tr. 82–92). Herbekian described these meetings as follows:

> I spoke to employees, and I asked employees to sign cards. And, I took those cards. I asked them to sign them, and then they gave them back to me. And, I reported to a number of people who asked me about the meeting, what had happened at the meeting.

(Tr. 40). As a result of these solicitations, Herbekian received seven signed authorization cards (Tr. 42).

Meanwhile, Sherwood Dameron spoke with seven employees about the union organizing effort. Five of the conversations took place entirely *outside* of work time (Tr. 297–300). Dameron spoke with Tiep Bui and Charatsri Maneepanth, cashiers at the Espresso Cafe, while Dameron was off the clock but while Bui and Maneepanth were sitting down together behind the counter, *not actually working* but during work time (Tr. 287, 299). Dameron gave

Bui and Maneepanth union authorization cards. He testified that Bui and Maneepanth were not busy, and that the solicitation of Bui and Maneepanth lasted a total of "[l]ess than five minutes" (Tr. 287, 299).

One of Dameron's non-work time conversations was with Victor Sangster, a chef's helper at Les Champs. Richard Sultoni, a chef at Les Champs affiliated with management, thereafter asked Sangster whether he had been approached recently by anyone concerning a union. Sangster replied negatively. Sultoni asked Sangster what he thought of unions; Sangster replied that he did not know much about unions, but that he would inform Sultoni if he were approached regarding a union (Tr. 248–49). Tiep Bui, the cashier in the Espresso Cafe, was also questioned by Sultoni. Bui told Sultoni that Dameron had given her a union authorization card, but that she had left it at home (Tr. 109). Charatsri Maneepanth was questioned by Sultoni the day after receiving an authorization card from Dameron. Maneepanth named Dameron as the source of the card.

On the morning of Tuesday, June 9, 1981 Roxie Herbekian was summoned to the office of Gene Flick, the general manager of the Company's Watergate facilities. Flick inquired whether Herbekian was aware of the Company's no-solicitation rule. Herbekian answered that she was unaware of the rule. Flick gave Herbekian a copy of the rule and reminded her that the rule was prominently posted by the timeclock, in the employee locker room, and on the employee bulletin board in Les Champs and the Peacock Lounge. Flick then suspended Herbekian for three days pending investigation of her alleged violations of the no-solicitation rule. When Herbekian returned to work the following Monday, she was fired by Flick.

Flick called Dameron into his office the afternoon of June 9, 1981, and likewise gave Dameron a three-day suspension pending investigation into the alleged solicitations. Dameron called Flick the next day to inquire about his employment status, whereupon Flick informed him that he had been fired.

## II.

On June 21, 1981 the Union filed a charge with the NLRB alleging that the Company had violated § 8(a)(1) and (3) of the National Labor Relations Act.[2] Of importance in the present appeal, the union alleged that the Company had promulgated an overly broad no-solicitation rule, had engaged in several instances of unlawful interrogation of employees, and had disparately enforced its no-solicitation rule in discharging Herbekian and Dameron, thus violating the statutorily protected right of employees to form a labor union. On August 26, 1981 the NLRB General Counsel issued a complaint.

Following a hearing the Administrative Law Judge held that Sultoni's interrogation, for the Company, of Sangster, Bui, and Maneepanth constituted an unfair labor practice under § 8(a)(1) (J.A. 20–21). With respect to the discharges of Herbekian and Dameron, the Administrative Law Judge held that the Company's no-solicitation rule was facially valid, but that the no-solicitation rule had been disparately enforced in violation of § 8(a)(3) (J.A. 21–23). The decision of the Administrative Law Judge that the Company had disparately enforced the rule was based on evidence that, during the year prior to the firings of

---

**2.** Section 8(a)(1) provides:
  It shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [National Labor Relations Act § 7]....
  29 U.S.C. § 158(a)(1) (1982).
  Section 7 guarantees employees the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted

activities for the purposes of collective bargaining....
  29 U.S.C. § 157 (1982).
  Section 8(a)(3) provides:
  It shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....
  29 U.S.C. § 158(a)(3) (1982).

Herbekian and Dameron, there had been six unpenalized *general* solicitations among the employees of Les Champs and the Peacock Lounge, some of which had the approval and participation of management. The record indicates that these were social solicitations for beneficent purposes that took place at least in part on work time.

At some point in 1980 employees were solicited to buy a cake as a going-away present for Renee Sanjines, a Les Champs waiter. Sherwood Dameron was among those employees who contributed $1.00 toward the cake (Tr. 265). The cake was presented to Sanjines in the presence of the Les Champs and Peacock Lounge employees (Tr. 266).

Three general solicitations collections occurred during December 1980. Renee Loustaunau, the manager of Les Champs, helped solicit and collect money to buy the Les Champs assistant manager a blazer as a going-away gift. One employee testified that she gave $5.00 toward the blazer (Tr. 162–63). At a staff meeting in 1980 manager Loustaunau mentioned that the chef's wife was expecting a baby. Several employees, including Sherwood Dameron, contributed $1.00 apiece toward the purchase of a spoon as a gift (Tr. 232–34, 250, 266–68). In December 1980 a collection was taken in order to purchase a birthday cake for a Les Champs waiter. Sherwood Dameron was among the contributors and attended the presentation of the cake by the Les Champs waiters and a couple of people from the Peacock Lounge (Tr. 260–61).

In February 1981 four employees and manager Loustaunau contributed money toward a gift for a housekeeper who was leaving the Company's employ (Tr. 164–65, 315–16).

In March 1981 $12.00 was collected by solicitation to buy a birthday cake for a Les Champs bartender. The cake was presented by the waiters of Les Champs and manager Loustaunau during break time (Tr. 157–58, 261–64).

The Administrative Law Judge characterized these solicitations, all of which occurred within a period of approximately one year, as "numerous and substantial" (J.A. 23). His opinion states:

> [T]he record [does not] disclose any adverse Respondent reaction to any of these nonunion situations. Against this background of condoned employee and supervisory solicitations, in violation of the rule, Dameron and Herbekian began to organize for the Union. Like the nonunion solicitations, these were conducted, at least in substantial part, on worktime. However, unlike the nonunion solicitations, these were not condoned. Within a week after the union solicitation began, the non-solicitation rule was promptly and vigorously enforced with the discharge of Herbekian and Dameron. It is clear, as a matter of Board and Court precedent, that the selective and disparate enforcement of a no-solicitation rule to prevent union solicitation is unlawful.

(J.A. 23). The Administrative Law Judge therefore recommended that the Company be ordered to cease and desist from disparately enforcing its no-solicitation rule. In addition, he recommended that Herbekian and Dameron receive backpay and be offered reinstatement to their former jobs or substantially equivalent employment (J.A. 24–25).

The NLRB General Counsel and the Company filed exceptions and supporting briefs with the NLRB. In a Board decision dated August 21, 1984 the NLRB in large measure affirmed the findings and conclusion of the Administrative Law Judge, and adopted his proposed order without substantial modification (J.A. 8–9).

The Company subsequently petitioned this court for review.

### III.

We must determine whether substantial evidence, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), supports the Board's decision that the facially valid no-solicitation rule, absolutely prohibiting solicitation "of *any* kind," was applied in a fashion that discriminated against the statutorily protected right of employees to form a union. The law is clear that a valid no-so-

licitation rule applied in a discriminatory manner or maintained for discriminatory reasons may not be enforced against union solicitation. *See Midwest Regional Joint Board v. NLRB*, 564 F.2d 434, 446 (D.C. Cir.1977); *William L. Bonnell Co. v. NLRB*, 405 F.2d 593, 595 (5th Cir.1969).

■ The statutorily protected organizing rights of employees may be limited only by the legitimate interests of the employer in discipline, workplace efficiency, and property protection. In *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), the Supreme Court held that such cases require "an adjustment between the undisputed right of self-organization assured to employees under the Wagner Act and the equally undisputed right of employers to maintain discipline in their establishments." *Id.* at 797–98, 65 S.Ct. at 985. In *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), a case decided after the 1947 enactment of the Taft-Hartley Act, the Court indicated approvingly that the Board, in an earlier case, had "[r]ecogniz[ed] that the employer could restrict employees' union activities when necessary to maintain plant discipline or production." *Id.* at 110, 76 S.Ct. at 683. The Court again stated: "No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline." *Id.* at 113, 76 S.Ct. at 685 (citing *Republic Aviation*, 324 U.S. at 803, 65 S.Ct. at 988).

In *Baylor University Medical Center v. NLRB*, 578 F.2d 351 (D.C.Cir.1978), this court upheld a broadly worded no-solicitation rule that prohibited "solicitation of employees ... by other employees or distribution of literature between employees during work time and/or in work areas." *Id.* at 352. This court held, *inter alia*, that it was not an unfair labor practice for the employer to bar solicitation in the corridors of the medical center, which were defined as "work areas," because solicitation was "the most probable potential recurrent cause of disruption in the corridors.... 

Having to confront the worry that employees might reduce their standards of service as part of a labor dispute seems an unnecessary and undesirable source of anxiety for persons [patients and visitors] already hard-taxed emotionally." *Id.* at 356. It was therefore the *disruption of the workplace rationale*, extending to the corridors, that this court relied on. *See also id.* at 360–61 (Leventhal, J., concurring in part and dissenting in part). In this respect the court was upheld by the Supreme Court in *NLRB v. Baylor University Medical Center*, 439 U.S. 9, 99 S.Ct. 299, 58 L.Ed.2d 202 (1978).

Decisions of the NLRB are in accord, as stated most clearly in a 1972 decision:

The [National Labor Relations] Act establishes and protects [an employee's] right to engage [in union solicitation], so long as there is no interference with production. Only a substantial business justification, such as a genuine interference with the progress of the work, justifies any restriction on this right of solicitation. A no-solicitation rule is *presumptively*, and only presumptively, valid if it is limited to prohibiting solicitation during the time an employee is expected to be working and not during breaktime, lunchtime, or the like.[2] Such a rule is valid because it is presumed to be directed toward, and to have the effect of, preventing interference with production.

[2] Where it could be shown from the characteristics of the work that union solication during worktime would in no way interfere with performance of the work, for example, Lil Abner's mattress-testing job, a no-solicitation rule of any kind would be invalid.

*Daylin Inc., Discount Division*, 198 N.L.R.B. 281, 281 (1972), *enf'd*, 496 F.2d 484 (6th Cir.1974). *See also Atkins Pickle Co.*, 181 N.L.R.B. 935, 937 (1970); *Emerson Electric Co.*, 187 N.L.R.B. 294, 300 (1970); *Hanes Hosiery, Inc.*, 219 N.L.R.B. 338, 350 (1975); *Sunnyland Packing Co.*, 227 N.L.R.B. 590, 594 (1976), *enf'd*, 557 F.2d 1157 (5th Cir.1977) (no-solicitation rule is permissible "provided that the rule or regulation is promulgated in good faith and bears some reasonable relation to efficient operation of the plant, and is not merely a device

to obstruct or impede self-organization.") (emphasis added); *George Washington University Hospital*, 227 N.L.R.B. 1362, 1373–74 (1977) ("The factual recital shows that the prospective solicitation policy generally was widely ignored in practice in respect to non-union matters which were neither more essential to nor less disruptive of the effective functioning of the hospital than the exercise of the statutory rights here involved...."); *Paceco, A Division of Fruehauf Corp.*, 237 N.L.R.B. 399, 401 (1978). *See generally*, 2 T. Kheel, Labor Law ch. 9A (1984).

■ Carefully developed legal doctrine indicates that restrictions on union solicitation must be justified by the employer's legitimate concerns for workplace efficiency. This is the only sensible way to reconcile the cases in this area. Thus, a ban on solicitation on working time and in working areas is presumptively valid; conversely, an employer may not generally prohibit union solicitation or the distribution of union literature by employees during nonworking times or in nonworking areas. *See NLRB v. Babcock & Wilcox, Inc.*, 351 U.S. at 112–13, 76 S.Ct. at 684–85; *Republic Aviation Corp. v. NLRB*, 324 U.S. at 797–98, 65 S.Ct. at 985. Employees may be restricted to distributing union literature and materials to nonworking time and nonworking hours. *See id.* Retail stores may ban solicitation from selling areas, though not from nonselling areas during break time or waiting time. *Daylin, Inc., Discount Division*, 198 N.L.R.B. 281 (1972), *enf'd*, 496 F.2d 484 (6th Cir.1974). Restaurants may ban employee solicitation during nonworking time from customer areas, *see McDonald's Corp.*, 205 N.L.R.B. 404 (1973), and hospitals may ban solicitation in patient care areas. *See Beth Israel Hospital v. NLRB*, 437 U.S. 483, 500–07, 98 S.Ct. 2463, 2473–77, 57 L.Ed.2d 370 (1978).

■ Disparate enforcement inherently requires a finding that the employer treated similar conduct differently. *Midwest Regional Joint Board v. NLRB, supra*, at 442. This is a fact-based inquiry in which the Board proceeds on a case-by-case basis. *See e.g., Hammary Manufacturing Corp.*, 265 N.L.R.B. 57, 57 n. 4 (1982); *Saint Vincent's Hospital*, 265 N.L.R.B. 38, 38–41, *enf'd*, 729 F.2d 730, 735 (11th Cir.1984). This court must therefore determine whether, in terms of actual interference with workplace production and discipline,[3] the numerous union solicitations by Herbekian during working time and the single isolated solicitation by Dameron, while he was off duty, were substantially equivalent to the numerous condoned instances of employee non-union solicitations of money primarily for social purposes.[4] This presents

---

**3.** The emphasis in the foregoing cases on the employer's interest in discipline, workplace efficiency, and property protection makes relevant our inquiry into the relative disruption of the workplace caused by the union and non-union solicitations, particularly because the Company rule prohibited *every* solicitation of every kind. If an employer sacrifices this interest in discipline and efficiency to allow disruption of the workplace by non-union solicitations, at least equivalent disruption by union solicitation must also be permitted. To hold otherwise would contradict the statutory language forbidding "discrimination ... [to] discourage membership in any labor organization." 29 U.S.C. § 158(a, 3) (1982).

**4.** The dissent suggests that the Board did not adequately address whether the union and non-union solicitations were substantially equivalent because the Board failed to "consider the *nature* of the non-union solicitations and their *effect* on the workplace." Dissent at 811. It then makes its own policy inquiry into the nature of the non-union solicitations and determines that

"[w]hatever minimal disruptive effect such solicitations may have would seem to be counterbalanced by an accompanying increase in employee morale and cohesion." Dissent at 812. There is no record evidence to support this conclusion. Nevertheless, the dissent concludes "the Company had a legitimate business reason for permitting these types of solicitations and cannot be charged with discriminatory enforcement in violation of section 8(a)(1) and (3) of the Act." *Id.*

The dissent's analysis not only is rooted in bald policy assertions—e.g., the debatable proposition that union solicitation is more disruptive of the workplace and less promotive of employee morale and cohesion than beneficent solicitation—but it also ignores the fact that the Company itself determined what types of solicitation would potentially disrupt plant discipline and production. The Company rule prohibits "solicitation of *any* kind, [even] including solicitation for ... charities, etc." (J.A. 5) (emphasis added). Given this *absolute bar* to any solicitation, which treats all solicitations alike, regardless of

two distinct questions since the solicitations by Herbekian and Dameron varied greatly.

## IV.

As set forth above, notwithstanding the unconditional ban on solicitation, the Company had condoned six *general* instances of solicitations of its employees for social purposes during the year prior to the discharge of Herbekian and Dameron. These non-union solicitations may be characterized as the ordinary, *ad hoc* expressions of friendship that naturally occur among small groups of people. Most of the solicitations involved individual requests during working hours in working places for contributions of $1.00, or larger sums for the blazer, among a small group of friends and co-workers. While these solicitations probably averaged at least ten workers (making a minimum total of around 50 to 60 solicitations), they probably took only a few seconds each.

■ Comparing Herbekian's union solicitations to the non-union solicitations, the former stand in marked contrast to the latter. During scarcely more than a month Herbekian spoke on twenty-two occasions with other employees about the union. These solicitations were concentrated into a short period and each contact occurred on work time in working areas in clear violation of the Company's rule. Moreover, Herbekian violated the no-solicitation rule in a systematic fashion that was quite different from the spontaneous general social collections that had occurred on six occasions during the previous year. It is equally obvious that Herbekian's solicitations on behalf of the union were significantly more involved than, say, a simple request to chip in for a small gift. According to Herbekian's testimony, her solicitations on behalf of the union often involved an explanation of the comparative merits of the union's dental, hospitalization, and legal plans (Tr. 97–98). It must therefore be concluded,

after considering the comparative *disruption of the workplace* that resulted from the solicitations for the union by Herbekian and the solicitations of some employees for social purposes, that there is no substantial evidence that the Company disparately enforced its no-solicitation rule to the prejudice of Herbekian. The object of the rule is to protect against interference in the workplace. The interference by Herbekian was substantial, systematic, and concentrated while the interference caused by the social solicitations was comparatively minimal and irregular. Since the interference in the workplace caused by Herbekian's solicitations substantially exceeded that condoned for social purposes, the facts do not support the Board's finding of a disparate application of the no-solicitation rule against Herbekian.

■ However, when Dameron's *single* union solicitation is compared with the numerous condoned non-union solicitations, a different situation is presented. Dameron is alleged to have violated the no-solicitation rule in his *one short conversation* with Bui and Maneepanth. According to Dameron's testimony, the conversation lasted a total of "[l]ess than five minutes" (Tr. 299), during which time he presented some of the merits of forming a union (Tr. 286–88). Dameron spoke with five other employees regarding the union, but these conversations took place outside of work time and thus could not be considered as basis for any valid enforcement of the Company's rule. The interference in the workplace caused by Dameron's solicitation was substantially less than that caused by Herbekian's solicitations and substantially less than the Company-condoned non-union solicitations. Thus, in discharging Dameron while condoning non-union solicitations that caused greater disruption of the working place, the Company disparately enforced its no-solicitation rule.

■ It bears repeating that the "essence of discrimination in violation of sec-

---

their purpose, the "nature" of the solicitations cannot determine whether like cases were treated differently for the purpose of determining a violation of section 8(a)(3). Instead, actual interference with production and discipline in the

workplace should measure whether a no-solicitation rule has been disparately enforced because the underlying purpose of no-solicitation rules is the preservation of workplace efficiency and discipline.

tion 8(a)(3) is treating like cases different-ly." *Midwest Regional Joint Board v. NLRB, supra,* at 442. It follows that con-doning greater violations while punishing lesser violations also constitutes disparate treatment. Dameron was discharged be-cause of his single solicitation of two em-ployees on work time, which on its face violated the Company's no-solicitation rule.[5] Of course, the social solicitations engaged in by the Company's employees were also admittedly in violation of the unconditional no-solicitation rule. We must decide whether, in terms of the *actual disruption of the workplace,* the respective solicita-tions were substantially equivalent.[6] The

5. On appeal the Company argues that Damer-on's discharge must be understood in the con-text of the union's intention to solicit all 200 of the employees in the Watergate complex. *See, e.g.,* Company Brief at 23, 31. However, such reasoning distorts the statutory scheme, and misinterprets the law dealing with no-solicita-tion rules.

Assessing the validity of no-solicitation rules requires the Board to serve two sometimes-con-flicting precepts: first, the imperative right of the employer to preserve the efficiency of the workplace; and, second, the statutorily protect-ed right of employees to form labor unions. Thus, an extremely broad no-solicitation rule, such as the one in this case, may validly provide for a complete prohibition on work time solici-tations. Since the underlying premise of the no-solicitation rule lies in preserving an effi-cient workplace, our focus must be on the *actu-al disruption* that occurs in the breach of the rule. In determining the validity of *Dameron's* discharge, it is therefore irrelevant that Herbeki-an violated the rule on numerous occasions or that the union had designs on organizing the Company's employees, because the Board's fo-cus must be on whether *Dameron's* actions by themselves were sufficient to warrant a valid discharge when compared with unpunished in-stances of non-union solicitation. It is therefore irrelevant that Dameron solicited five employ-ees *outside* of work time because such five solic-itations were not prohibited by the employer's no-solicitation rule and thus could not form the basis of a valid discharge.

The Company additionally seems to miscon-strue the very notion of disparate enforcement, *i.e.,* treating like things differently. *See Midwest Regional Joint Board v. NLRB, supra,* at 442. The Company assumes that there exists some threshold level of non-enforcement of its *uncon-ditional* no-solicitation rule, under which the rule remains applicable to prohibit union solici-tation but not applicable to prohibit non-union solicitations. *See* Company Reply Brief at 4. The disparate enforcement inquiry does not, however, give the Board license to make such distinctions. The Board instead must measure, in terms of the *actual disruption to the work-place,* the instances of condoned, non-union so-licitations against the instances of union solici-tations that led to the employee's discharge. *See supra* at 803, *et seq.* Only then can the Board, and this court on review, determine whether the employer "treat[ed] like cases dif-ferently." *Midwest Regional Joint Board, supra.*

6. The dissent urges that beneficent collections for fellow employees should not be compared to union solicitations for purposes of determining whether a no-solicitation rule has been dispar-ately enforced. Dissent at 812–813. With one exception, the cases cited by the dissent for the proposition that "purely beneficent acts are different *in kind* from union solicitations for purposes of a claim of discriminatory mainte-nance or enforcement of a no-solicitation rule," Dissent at 812, involved employer rules that forbade only *union* solicitation.

Although the dissent contends that a "no-un-ion solicitation" rule is comparable to an *"abso-lute* no-solicitation" rule for purposes of deter-mining discriminatory treatment of union activ-ity, Dissent at 812 n. 3, Board policy has long been to the contrary. In *Emerson Elec. Co.,* 187 N.L.R.B. 294 (1970), a rule prohibiting *only* un-ion solicitation was declared to be "not a 'no-so-licitation' notice in the strict sense.... [T]his notice is a 'no-union solicitation' notice, unlike the classic type of rule or notice heretofore considered by the Board. *There is a distinct difference between the two." Id.* at 299 (foot-note omitted) (emphasis added). Precisely be-cause the notice in *Emerson* prohibited "solicita-tion in behalf of or against a union and *nothing else,"* it was deemed to be

completely irrelevant to the issues presented in [Emerson] that solicitations were made for blood or collections were taken up for flow-ers, deceased employees or their relatives, Christmas and birthday presents, or for em-ployees or families who were financially dis-advantaged, all being the "beneficant [sic] acts" referred to by the United States Court of Appeals for the Tenth Circuit in *Serv-Air, Inc. v. N.L.R.B.* (395 F.2d 557 [1968] ), and the "isolated instances of other permitted solicita-tions" recently approved by the Board in *At-kins Pickle Company, Inc.* (181 NLRB No. 144).

*Id.* at 300 (emphasis in original).

Unlike *Emerson* and the cases cited by the dissent which addressed rules that prohibited *only* union solicitation, here we have an *abso-lute* no-solicitation rule that specifically prohib-its even solicitation for charities. Thus, deci-sions involving "no-*union* solicitation" rules are inapposite and comparison of the tolerated be-neficent solicitations with the punished union solicitations in this case is required to deter-mine whether the rule was disparately enforced.

Although the dissent quotes Board language that "an employer's tolerance of isolated benefi-

social solicitations permitted by the Company were only nominally disruptive of the workplace, but Dameron's single solicitation of Bui and Maneepanth was even less disruptive than the social solicitations. Although the six instances of condoned general solicitations involved solicitations in which each single solicitation lasted only a few seconds, each general solicitation involved solicitation of a number of employees. Dameron's single solicitation, while he was "off the clock," of the two employees who were not working and might be said to have been on "waiting time" [7] lasted "[l]ess than five minutes" (Tr. 299), and was thus of substantially lesser duration and intrusion than the six condoned *general* solicitations, which involved a total of many more employees.

■ For purposes of our inquiry then, the condoned solicitations and Dameron's solicitation both violated the rule prohibiting "[s]olicitation of any kind ..." and constituted like cases that were treated differently by the Company.[8] Substantial evidence therefore supports the conclusion that the Company in its discharge of Dameron disparately enforced its no-solicitation rule in violation of § 8(a)(3).[9]

## V.

In conclusion, we affirm the Board's holding that the Company's discharge of Sherwood Dameron, for conduct that involved less actual interference with the workplace than the condoned social solicitations, constituted disparate treatment in violation of § 8(a)(3) of the Act. Dameron is entitled to receive backpay and reinstatement to his former job or substantially similar employment. It is noted that Dameron's eligibility for an award of backpay is subject to mitigation by the sum of money he earned or could have earned between the time of discharge and the time of our decision.

With respect to Roxie Herbekian, her union solicitations in violation of the no-solicitation rule were substantial and concentrated and disrupted the workplace substantially more than the condoned social solicitations. Thus, her discharge did not constitute disparate treatment in violation of § 8(a)(3). The court therefore denies enforcement of the Board's decision that the Company violated § 8(a)(3) in the discharge of Herbekian.

The Company does not challenge the Board's decision that the Company violated

cent solicitation does not by itself constitute sufficient evidence of disparate treatment of union solicitation," Dissent at 813 (quoting *Hammary Mfg. Corp.*, 265 N.L.R.B. 57, 57 n. 4 (1982)), it fails to acknowledge that the Board "has never granted a blanket exemption to all charitable solicitation. Indeed, the Board has consistently evaluated evidence of such solicitation in determining whether a rule has been discriminatorily enforced." *Saint Vincent's Hospital*, 265 N.L.R.B. 38, 39 (1982) (footnote omitted), *enf'd*, 729 F.2d 730 (11th Cir.1984). Thus, in two cases cited by the dissent—*Hammary Mfg. Corp.* and *Saint Vincent's Hospital* —the Board compared the tolerated beneficent solicitations with the punished union solicitations, and concluded that the absolute no-solicitation rule in each case was disparately enforced. Other Board decisions have consistently demonstrated that social solicitation should be compared with union solicitation in addressing claims of disparate treatment under an *absolute* no-solicitation rule such as is involved here. *See, e.g., The Seng Co.*, 210 N.L.R.B. 936 (1974); *Daylin Inc., Discount Division*, 198 N.L.R.B. 281 (1972), *enf'd*, 496 F.2d 484 (6th Cir. 1974); *Hanes Hosiery, Inc.*, 219 N.L.R.B. 338 (1975); *Sunnyland Packing Co.*, 227 N.L.R.B.

590 (1976), *enf'd*, 557 F.2d 1157 (5th Cir.1977); *George Washington University Hospital*, 227 N.L.R.B. 1362 (1977); *Lance, Inc.*, 241 N.L.R.B. 655 (1979); *Montgomery Ward & Co.*, 224 N.L.R.B. 104 (1976).

7. *See* Daylin, Inc., Discount Division, 198 N.L.R.B. 281 (1972), *enf'd*, 496 F.2d 484 (6th Cir. 1974) (noting that solicitors were "caught up with their work" and solicitation did not interfere with duties of employees).

8. For the sake of determining whether the no-solicitation rule was disparately enforced, the condoned solicitations and Dameron's solicitation may be treated as "like cases," even though Dameron's solicitation was actually *less* disruptive of the workplace than the social solicitations.

9. The Board invites us on appeal to link the § 8(a)(1) violations committed by Sultoni with Dameron's discharge. *See, e.g.,* NLRB Brief at 15–16. However, neither the Administrative Law Judge nor the Board relied on Sultoni's § 8(a)(3) violation in the discharge of Dameron, and such *post hoc* rationalization cannot support the Board's decision.

§ 8(a)(1) of the Act by interrogating employees about union activities. We therefore affirm the Board in this respect and remand the case to the NLRB for further action not inconsistent with this opinion.

*Judgment accordingly.*

BORK, Circuit Judge, dissenting in part and concurring in part:

I dissent from that part of the majority opinion which holds that the petitioner, Restaurant Corporation of America ("the Company" or "the petitioner"), committed an unfair labor practice by enforcing its no-solicitation rule against Sherwood Dameron while tolerating six instances of intra-employee generosity. Because the Board's finding of discriminatory enforcement is not based on evidence that the Company has "treated similar conduct differently," *see* maj. op. at 806, is therefore unsupported by substantial evidence, and departs without explanation from the Board's prior decisions, I would grant the petition for review and deny the petition for enforcement of the Board's decision.[1]

### A.

Section 7 of the National Labor Relations Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157 (1982). This provision "necessarily encompasses the right [of employees] effectively to communicate with one another regarding self-organization at the jobsite." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491, 98 S.Ct. 2463, 2468, 57 L.Ed.2d 370 (1978). The right to solicit for union membership at the workplace, however, is not without limitation. Instead, the right must be balanced against "the equally undisputed right of employers to maintain discipline in their establishments." *Republic Aviation*

*Corp. v. NLRB*, 324 U.S. 793, 798, 65 S.Ct. 982, 985, 89 L.Ed. 1372 (1945); *see also NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113, 76 S.Ct. 679, 685, 100 L.Ed. 975 (1956) ("No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline.").

To accommodate these competing interests, the Board has adopted, and the Supreme Court has approved, presumptions regarding the validity of employers' no-solicitation rules. A rule which prohibits solicitation during work hours and in work areas is presumptively valid. Conversely, a rule which prohibits solicitation during non-work hours and in non-work areas is presumptively invalid. *Republic Aviation Corp.*, 324 U.S. at 797–98, 803–05 & n. 10, 65 S.Ct. at 985, 988–89 & n. 10; *Beth Israel Hosp.*, 437 U.S. at 493, 98 S.Ct. at 2470.

A facially valid no-solicitation rule, however, may form the basis of a violation of the Act if it is enforced in a discriminatory manner. Evidence which shows that an employer has permitted nonunion solicitation but has enforced a no-solicitation rule against union solicitation undermines the presumption of validity: "where no-solicitation rules are applied only as to union activity while other types of solicitation have gone unchallenged by the employer, the inference arises that the rules are not being used simply to serve the ends of plant order and production." *William L. Bonnell Co. v. NLRB*, 405 F.2d 593, 595 (5th Cir.1969). Thus, when the Board can "show affirmatively by substantial evidence," *Midwest Stock Exch., Inc. v. NLRB*, 635 F.2d 1255, 1259 (7th Cir.1980), that an employer's disparate enforcement of a no-solicitation rule is not related to plant discipline or efficiency, but instead is an effort to discriminate against union activity, then the employer is in violation of

---

1. I concur in the result reached by the majority with respect to the discharge of Roxie Herbekian and in the majority's affirmance of the Board's decision that the petitioner violated

§ 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1982), by interrogating employees about union activities.

sections 8(a)(1) and 8(a)(3) of the Act.[2] *Midwest Regional Joint Bd. v. NLRB*, 564 F.2d 434, 446 (D.C.Cir.1977); *William L. Bonnell Co.*, 405 F.2d at 595.

The Board's finding of discriminatory enforcement in this case is not supported by any evidence which would serve to rebut the presumption that the Company's enforcement of the no-solicitation rule against union solicitation was related to its legitimate interest in maintaining plant discipline. Instead, the sole basis for the Board's finding of discriminatory enforcement is evidence that the Company did not enforce its no-solicitation rule against solicitations that are very different from union solicitations and which by their nature would not adversely affect plant discipline. The Administrative Law Judge's conclusion that the Company violated section 8(a)(1) and (3) of the Act by disparately enforcing its no-solicitation rule against Herbekian and Dameron was based on evidence that, during the year prior to the discharges, the Company permitted six nonunion "solicitations." These consisted of the following: (1) sometime in 1980, a collection was taken to buy a going-away cake for a Les Champs waiter (Transcript ("Tr.") 265–66); (2) in December 1980, Les Champs manager Renee Loustaunau collected contributions to buy a blazer as a going-away gift for the assistant manager (Tr. 162–63); (3) in December 1980, after Loustaunau mentioned at a staff meeting that the chef's wife was expecting a baby, several employees contributed $1.00 each for the purchase of a spoon as a gift (Tr. 231–34, 250, 266–68); (4) in December 1980, employees contributed toward the purchase of a birthday cake for a Les Champs waiter (Tr. 260–61); (5) in February 1981, Loustaunau and four employees chipped in to buy a going-away gift for a housekeeper (Tr. 164–65, 315–16); and (6) in March 1981, employees collected a total of $12.00 to buy a birthday cake for a Les Champs waiter (Tr. 157–58, 261–64).

The ALJ found that these nonunion solicitations were "numerous and substantial" and that they had been condoned by the Company. Based on these findings, the ALJ concluded that the Company's enforcement of the rule against Herbekian and Dameron was discriminatory and therefore violated the Act. Joint Appendix ("J.A.") at 23. The Board adopted this finding without further explanation. *Id.* at 8–9.

The Board clearly has not met its burden of showing that the Company's disparate enforcement of the no-solicitation rule was not related to the legitimate interest in plant discipline. First, it did not even address the question of whether the disparate enforcement was justified on the ground that the permitted solicitations and the union solicitation could be distinguished on the basis of that interest. Instead, the Board simply noted the number and duration of the permitted nonunion solicitations and wholly failed to consider the *nature* of the nonunion solicitations and their *effect* on the workplace. The Board did not determine whether or not the nonunion solicitations had the potential to interfere with plant discipline and thus had no basis upon which to compare them to union solicitation for purposes of the Act. If the permitted nonunion solicitations do not have the potential to affect plant discipline, then the employer's failure to enforce the no-solicitation rule against them does not raise the inference that the rule is not being used to serve legitimate ends, and the presumption of validity stands. Because "the essence of discrimination in violation of section 8(a)(3) is treating *like cases* differently," *Midwest Regional Joint Bd.*, 564 F.2d at 442 (emphasis added), the Board was required under the Act to consider the nature of the permitted nonunion solicitations and to find that they were "like" union solicitation with respect to their potential effect on plant discipline. Because the Board has

---

2. Section 8(a)(1) of the Act provides:
   It shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the Act].
   29 U.S.C. § 158(a)(1) (1982).
   Section 8(a)(3) of the Act provides:

It shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.
29 U.S.C. § 158(a)(3) (1982).

not made this finding, the petition for review should be granted.

Second, had the Board considered the nature of the permitted nonunion solicitation, it would have been unable to support a finding of discriminatory enforcement consistent with the law and its prior policy concerning purely beneficent acts. The activities that the Board measured against union solicitation are, according to the Board's prior policy, nothing like union solicitation with regard to their effect on the discipline of the workplace. All were instances of intra-employee generosity designed to express appreciation of fellow employees on occasions such as birthdays or departures. Whatever minimal disruptive effect such solicitations may have would seem to be counter-balanced by an accompanying increase in employee morale and cohesion. Thus, the Company had a legitimate business reason for permitting these types of solicitations and cannot be charged with discriminatory enforcement in violation of section 8(a)(1) and (3) of the Act.

Prior to its decision on review here, the Board had adopted and consistently applied this rationale. In dismissing a complaint alleging discriminatory maintenance and enforcement of a no-solicitation rule, the Board held:

It is to this maintenance of discipline that we must look ... in assessing the validity of the [no-solicitation] rule. No one can seriously contend that collections for a "sunshine fund" or the alleviation of the misfortunes or bereavement of an employee are the sort of activities that generate heated contention and dispute. On the other hand, the history of modern labor relations clearly demonstrates that the subject of unions and the solicitations on behalf of unions can and most certainly do generate divergent points of view among the working fraternity, even to the point of loud debate and fisticuffs. Thus it would appear that one type of solicitation is conducive to an impairment of order and discipline and the other is not. To the extent, then, that an employer, in the exercise of his established right to maintain discipline, sees fit to proscribe only the variety of solicitation that actually tends to impair discipline without interfering with the variety that does not, I fail to see that such an employer thereby rebuts the presumption that his actions are legal.

*Emerson Elec. Co.*, 187 N.L.R.B. 294, 300 (1970) (footnote omitted). The view that purely beneficent acts are different *in kind* from union solicitations for purposes of a claim of discriminatory maintenance or enforcement of a no-solicitation rule is also shared by other courts that have addressed the issue. *See United Aircraft Corp. v. NLRB*, 440 F.2d 85, 96–97 (2d Cir.1971); *Hosiery Corp. of Am. v. NLRB*, 422 F.2d 784, 787–88 (4th Cir.1970); *Serv-Air, Inc. v. NLRB*, 395 F.2d 557, 560 (10th Cir.1968); *TRW, Inc. v. NLRB*, 393 F.2d 771, 774 (6th Cir.1968).[3]

Based on the eloquent reasoning of the Board, and on the cited precedent, I would hold that the solicitations permitted in this case are not similar to union solicitation with respect to their effect on the workplace and, therefore, that the Company's failure to treat the two alike does not constitute "discrimination" within the meaning of section 8(a)(3) of the Act. In my view, any other holding would render mainte-

---

3. The majority contends that all but one of these cited cases are irrelevant because in each case the court addressed a no-solicitation rule which prohibited only union solicitation and in this case the no-solicitation rule prohibits all solicitation. *See* maj. op. at 808–809 n. 6. This statement is incorrect. The type of no-solicitation rule at issue in a particular case has no relevance to the question of whether an employer has discriminated against union solicitation. When a no-solicitation rule by its terms prohibits only union solicitation, and an employer permits nonunion solicitation, the issue is whether the rule was *adopted* to discriminate against union activity. When a no-solicitation rule prohibits all solicitation and an employer permits nonunion solicitation but prohibits union solicitation, the issue is whether the rule is being discriminatorily *applied* against union activity. But the underlying legal analysis in each case is the same—the issue is whether the employer has treated similar conduct differently. Thus, one line of cases serves as precedent for the other line of cases on the question of whether an employer has discriminated against union activity.

nance of a no-solicitation rule practically impossible and would completely deprive an employer of his right to maintain discipline in the workplace. For instance, under the Board's approach, which considers only the number and duration of nonunion solicitations without regard to the nature of those solicitations, even a brief exchange between two employees about getting together after work could not be tolerated by employers without risking a later finding that they have engaged in illegal discrimination. Unless employers are willing to enforce no-solicitation rules against such conduct, they will be forced to forgo enforcement of the rule to prevent other, more disruptive forms of solicitation. The Act does not require that choice.

### B.

I would also grant the petition for review because the Board's decision is clearly inconsistent with its past decisions. *See NLRB v. Sunnyland Packing Co.,* 557 F.2d 1157, 1160 (5th Cir.1977). The Board has never based a finding of disparate enforcement on the type of nonunion solicitations at issue here. Instead, the Board has consistently held in the past that "an employer's tolerance of isolated beneficent solicitation does not by itself constitute sufficient evidence of disparate treatment of union solicitation." *Hammary Mfg. Corp.,* 265 N.L.R.B. 57, 57 n. 4 (1982); *see also Saint Vincent's Hosp.,* 265 N.L.R.B. 38, 40 (1982), *enforced,* 729 F.2d 730, 735 (11th Cir.1984); *The Seng Co.,* 210 N.L.R.B. 936, 936 (1974); *Serv-Air, Inc.,* 175 N.L.R.B. 801, 802 & n. 3 (1969).

Though the ALJ in this case concluded that the six instances of permitted nonunion solicitation in the year preceding the discharges were "numerous and substantial," this finding is not supported by substantial evidence. The Board has not even attempted to explain why six instances of nonunion solicitation constitute "numerous and substantial" solicitations while five instances of nonunion solicitation do not.

*See Serv-Air, Inc.,* 175 N.L.R.B. at 801. Thus, the Board's decision in this case is flatly inconsistent with all of its prior decisions on this issue.

In fact, the Board has in the past refused to find unlawful discrimination when the incidents of permitted nonunion solicitation were as "isolated" and of a more disruptive character than the nonunion solicitations in this case. In *Serv-Air, Inc.,* the Board held that a finding of disparate enforcement was not established by an employer's permission of at least three solicitations to pay for flowers to be sent to the widows of deceased employees and to the hospitalized wife of an employee, as well as two solicitations regarding employee contributions to the Community Chest and the Red Cross. 175 N.L.R.B. at 801. Similarly, in *United Aircraft Corp. v. NLRB,* 440 F.2d 85, 96–97 (2d Cir.1971), the Board found no disparate enforcement of a no-solicitation rule even though the employer "periodically" allowed solicitation for charities and gifts.

Though the solicitations permitted in *Serv-Air* and *United Aircraft* were limited to "beneficent acts," they differ from the solicitations permitted in this case because solicitations on behalf of charities involve outside organizations. With respect to their effect on plant discipline, therefore, charitable solicitations may be more like union solicitations than are solicitations that represent employees' generosity to one another. Thus, it is significant that the Board has been unable even to identify a case in which a finding of disparate enforcement was based solely on an employer's permission of *charitable* solicitations.[4]

Finally, the cases cited by the Board do not support its decision in this case. In *Midwest Stock Exch., Inc. v. NLRB,* 635 F.2d 1255 (7th Cir.1980), the court found that an employer discriminatorily enforced its no-solicitation rule by strictly enforcing the rule against union activities but permitting "[s]uch drives as the Crusade of Mercy, collection of blood in a bloodmobile ... [on the employer's] premises, the selling of

---

**4.** Depending on the number and intrusiveness of the solicitations, I assume that such permission could amount to disparate enforcement if

the Board found the relevant charitable solicitations to be similar to union solicitation in terms of the potential interference with work.

Avon products, Tupperware, boat cruise tickets, raffle tickets, Girl Scout cookies, and a number of other items." *Id.* at 1270. Of course, these numerous and varied solicitations were not limited to acts of employee generosity to fellow employees or even to charitable solicitations. Rather, they involved solicitations for personal profit as well as highly organized campaigns on behalf of outside business organizations and thus posed a much greater potential for interference with work than the solicitations the Company permitted here.

The remaining cases cited by the Board are simply inapposite. Though some involved acts of generosity between employees, all permitted anti-union or pro-company solicitation, solicitation that is unquestionably similar to union solicitation in its effect on the discipline of the workplace. *See, e.g., Midwest Regional Joint Bd. v. NLRB,* 564 F.2d 434, 446 (D.C. Cir.1977) (disparate enforcement found where "Company countenanced the distribution of pro-Company literature ..., while strictly enforcing the rule with respect to the distribution of pro-Union literature "); *Ridgewood Management Co. v. NLRB,* 410 F.2d 738, 740 (5th Cir.) (no-solicitation rule discriminatory where employer permitted solicitations ranging from candy sales to church donations as well as solicitations designed to persuade employees not to unionize), *cert. denied,* 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83 (1969); *NLRB v. Electro Plastic Fabrics,* 381 F.2d 374, 376 (4th Cir.1967) (no-solicitation rule found discriminatory where employer permitted collections for gifts for employees, sales of cosmetics and other merchandise, and anti-union solicitations). That the employer permitted anti-union or pro-company solicitations in all of these cases conclusively distinguishes them from the present case.

For these reasons, and because I believe that the majority decision will have an unhappy effect on the workplace, I respectfully dissent.